No. 17,977.

WALTER S. LOWE *v.* PEOPLE OF THE STATE OF COLORADO.
(309 P. [2d] 601)

Decided April 8, 1957.

Mr. HENRY BLICKHAHN, Mr. WHITFORD W. MYERS, for plaintiff in error.

Mr. DUKE W. DUNBAR, Attorney General, Mr. FRANK E. HICKEY, Deputy, Mr. JOHN W. PATTERSON, Assistant, for defendant in error.

*En Banc.*

MR. JUSTICE KNAUSS delivered the opinion of the Court.

PLAINTIFF in error, the coroner of Conejos County, and herein referred to as defendant, or Lowe, was found guilty in the district court of a misdemeanor, to-wit: accessory after the fact to the murder of one Virginia Armijo by her husband, Jerry Armijo. Lowe brings the case here on writ of error.

The information charged that on June 18, 1955, Jerry Armijo "unlawfully, feloniously, wilfully, deliberately

and of his premeditated malice aforethought" killed and murdered his wife Virginia and that "after the aforesaid Jerry Armijo had committed the aforesaid crime of murder he did conceal the aforesaid crime and Walter S. Lowe after full knowledge that the aforesaid crime had been committed by the aforesaid Jerry Armijo, and on *June 20,* 1955, and continuously since * * * did then and there knowingly conceal it from the magistrate and harbor and protect *the person charged with the aforesaid crime, namely Jerry Armijo;* contrary to the form of the statute * * *." (Emphasis supplied.)

For a considerable time prior to the happening of the events hereafter described, Jerry Armijo had been an investigator for the District Attorney in Conejos County.

It appears from the record that Lowe, Jerry Armijo and the latter's wife, Virginia, together with other persons, attended a dance in the town of La Jara, Colorado, on the night of June 17, 1955. Armijo and his wife returned to their home shortly after 1:30 A.M. on June 18, 1955, being transported thereto in Lowe's automobile. Armijo at that time was intoxicated. Virginia Armijo was shot and killed by someone who fired a gun before she entered her residence. The bullet which caused her death entered her head near her left eye and a hole was found in the back of her skull where ostensibly the bullet emerged. Neither the bullet nor the weapon from which it was fired was ever located.

Silvano Armijo, the seventeen-year-old nephew of Jerry Armijo, testified that he was asleep in the bedroom of the Armijo residence at about 1:30 A.M. on June 18, 1955. He said he was awakened when Jerry came into his room, which at all times was unlighted, and while he did not see what Jerry removed from the dresser in the room, he was of the opinion that his uncle took a gun from the dresser drawer and went outside. Thereafter Silvano heard a shot, sat up in bed for a while and then went to a window where he said he saw Jerry and defendant Lowe behind a cream-colored

Chrysler automobile, where they appeared to be talking. He then said that defendant walked over to where Mrs. Armijo's body was lying on the ground and said: "She is dead." Thereupon Silvano went back to bed. Later Jerry came into Silvano's room, stood beside his bed, and then went to the telephone in the house and called defendant Lowe. At that time Silvano said Jerry had a .38 revolver in his possession.

Lowe and his wife testified that defendant reached his home and was almost ready for bed when he received an emergency phone call from Jerry, and pursuant thereto went to the Armijo residence, after which he called one Roy Davis, his employee. About 2:15 A.M. on June 18, 1955, defendant called George Lippincott, town marshall of La Jara, Colorado, and a deputy sheriff of Conejos County, who immediately went to the Lowe residence. He testified that Lowe, Armijo and others were there; that Lowe was in the front yard of the premises with a .20 caliber pistol in his hand, which Lowe said he had for his own protection because he feared trouble with Armijo. Lippincott said Armijo wanted to get his revolver for the purpose of killing the "men from Monte Vista."

Lippincott testified that when he first saw Armijo at the Lowe residence he was highly intoxicated — "acting like a madman. He made a lunge at me, called me a vile name * * * notified me not to come to that house [Armijo's] and that I would get hurt, and he made a swing at me and kind of missed me and hit Mr. Lowe with a glancing blow." This witness for the People said that at the Lowe house Armijo said he knew the men who killed his wife; that they were from Monte Vista; that they had taken four shots at him and his wife and drove off in a black car. Thereupon Lippincott, Davis, Lowe and Armijo went to the Armijo home where Lippincott inspected the exterior of the house to see if any bullet marks appeared. When none was found Jerry told Lippincott "that there wasn't any car. I think those shots

came from the alley or over on the north side from the dark. I don't know where the shots came from." Armijo said that Lowe heard the shots. This Lowe denied and Armijo replied: " * * * you're a G- D- liar, you did hear them."

It is not disputed that Lowe called Lippincott, the local deputy sheriff to the scene and that Mr. Rowe, the deputy district attorney, was also there, as well as Sergeant Houston of the Highway Patrol who was called by the deputy sheriff. The sheriff of Conejos County arrived about 4 A.M. and later the sheriff of Alamosa County came upon the scene. All of these parties conferred with Jerry and Mr. Rowe, the deputy district attorney, out of the presence of Lowe. The law enforcement officers also conferred with Lowe. From the record we have failed to find anything that Lowe did or that he failed to do which hindered these public officials and law enforcement officers in the discharge of their duties.

It appears that Mr. Green, the district attorney of that district, was ill in a hospital in Monte Vista, Colorado, and early on the morning of June 18, 1955, the sheriff of Alamosa County, Sergeant Houston, Mr. Rose, Green's deputy, and Lippincott went to Monte Vista with Lowe and conferred with Mr. Green regarding the events at La Jara.

Jack Gilmore, a private investigator, endorsed as a witness for the People, but called as a witness for the defendant, testified that on June 17 or 18, 1955, he was requested by the district attorney to report to Rowe because the deputy district attorney had asked for help on the investigation. Gilmore went to Monte Vista and attended the conference in the hospital room of District Attorney Green when Lowe was present. Later Gilmore took Jerry to view the remains of Mrs. Armijo and testified that while standing beside the casket Armijo exclaimed: "I didn't mean to do it, honey, I didn't mean to do it."

The body of the deceased was in defendant's ambulance and when it was removed to the preparation room of the morgue, Lippincott requested that when Lowe removed the bullet he, Lippincott, would like to have it, and he said that Lowe agreed thereto. There was testimony by Lippincott that upon examination of the rear of the skull of Mrs. Armijo there was no point of exit of the bullet, and that there was "a knot above the mastoid bone." Sergeant Houston of the Highway Patrol who was called by Lippincott, viewed the body about 5 A.M. and testified that the skull showed a point of exit and that the body was then partially embalmed. Defendant and his wife testified that no bullet was lodged in the head of Mrs. Armijo, and no bullet was ever found. On June 20th Jerry took his own life.

It is not disputed that an inquest was scheduled for June 18, 1955, but canceled because Lowe had "determined how she died." This was after Jerry declared: "Honey, I didn't mean to do it, honey."

While numerous grounds are urged for reversal, we will consider only the sufficiency of the evidence to sustain the verdict.

■ The charge as laid is that Armijo killed his wife. Under our statute, C.R.S. '53, 40-1-13, the conviction of the principal is not a condition precedent to the conviction of an accessory.

In *Roberts v. People*, 103 Colo. 250, 87 P. (2d) 251, this court said: "The action of the accessory in harboring the criminal or concealing the crime cannot affect the perpetrator's factual status as to guilt or innocence but may well be a contributing factor, *even the controlling factor, in preventing a conviction for a crime committed.*"

■ C.R.S. '53, 40-1-13, under which this prosecution was had provides:

"An accessory after the fact is a person who, after full knowledge that a crime has been committed, conceals it

from the magistrate, or harbors and protects.the person charged with or found guilty of the crime."

This brings us to the inquiry: What did Lowe do or not do under this record which would bring him within the provisions of this statute? Does the record exhibit competent testimony that defendant, after full knowledge that a crime had been committed (in this instance the murder of Virginia Armijo), conceal it. from the magistrate? We think not. It is not claimed that defendant did "harbor or protect the person [Armijo] charged with or found guilty of the crime."

In order to make a case under the information in this case, the People were required to establish that Jerry Armijo murdered his wife; that with knowledge of this fact the defendant concealed the commission of the crime; or that after full knowledge of defendant's part that Armijo had murdered his wife, he harbored and protected said Armijo.

It is abundantly clear from the record that Mrs. Armijo had been shot and it is not even intimated that defendant did anything to prevent the legally constituted authorities from knowing that Mrs. Armijo had been slain.

The only evidence appearing in the record tending to establish that Jerry Armijo fired the bullet with which his wife was killed is that he was with her just prior to her death, and that after her body was embalmed and laid out in the mortuary he is alleged to have exclaimed as he viewed the remains, "I didn't mean to do it honey, : I didn't mean to do it," Defendant, as coroner, thereupon called an inquest. Within a short time after Armijo viewed the remains of his wife he took his own life. The scheduled inquest was not held.

Mere silence as to one's knowledge of a felony, with no intent to aid the felon, or mere failure to inform the public authorities, does not establish such person as an accessory after the fact.

"Whether one is an accessory after the fact depends

on whether what he did was a personal help to the offender to elude punishment. He need only aid the criminal to escape arrest and prosecution. * * * This rule, however, does not render one an accessory after the fact who, knowing that a crime has been committed, merely fails to give information thereof." 14 Am. Jur. 837, Sec. 103.

In the case before us there is no evidence that Lowe gave any "personal help to the offender [Armijo]." In fact he summoned not only the local deputy sheriff, but the sheriff of the county and a highway patrol officer, as well as the sheriff of an adjoining county and the deputy district attorney, all of whom came to the scene. None of these peace officers even suggested that an arrest be made and yet the district attorney, interviewed in his hospital room in another county by Lowe and these law enforcement officials, filed an information claiming that Armijo murdered his wife and that defendant Lowe is guilty of being an accessory after the fact because he, Lowe, knowing full well that Armijo was guilty of murder failed to arrest him and turn him over to a magistrate.

To convict a defendant under the accessory statute, C.R.S. '53, 40-1-13, one of two elements must be proved. Either that Jerry murdered his wife, and, that after a full knowledge of the commission of said crime, defendant concealed the same from the magistrate, or, in the alternative that Lowe harbored and protected Jerry after he had full knowledge that he had murdered his wife.

The record is strangely silent as to any reason or motive for Jerry to kill his wife. The only evidence is that she died of a bullet wound, and that following the discovery of the body Jerry acted like a madman, and in the presence of a private detective said: "Honey, I didn't mean to do it." All the jury could do was to speculate upon how the fatal wounds were received by Mrs. Armijo. In criminal cases verdicts based upon sup-

position and conjecture cannot stand. *People v. Urso,* 129 Colo. 292, 269 P. (2d) 709. In the instant case the only witness offering any direct evidence was Silvano Armijo, the seventeen-year-old lad, who did not disclose to the authorities the facts testified to by him at the trial until after Jerry had committed suicide.

The record shows that defendant did not harbor or protect Jerry. In fact Lowe almost immediately called deputy sheriff Lippincott. At all times Armijo's whereabouts were known and he, as the father of three children, was at his home or in the immediate vicinity at all times until he took his life. Nothing was done by defendant which in any way prevented Lippincott, or any other officer, from arresting Armijo had he desired to do so. If it was the theory of the prosecution that Lowe was a participant in the slaying of Mrs. Armijo, then he might be proceeded against as a principal, but not as an "accessory after the fact."

After a careful examination of this record, we are satisfied that the evidence offered was insufficient to overcome the presumption of innocence which clothes every defendant accused of crime, and that the motion for a directed verdict of not guilty, made on behalf of Lowe, was well taken, and its denial was error.

The judgment is reversed and the cause remanded with directions to dismiss the information and discharge the defendant.

MR. JUSTICE SUTTON and MR. JUSTICE HALL not participating.