# UNITED STATES of America, Plaintiff-Appellee,

### v.

## Jake Keller NEAL, Defendant-Appellant.

### No. 82–1803.

United States Court of Appeals, Tenth Circuit.

Sept. 4, 1984.

Logan, Circuit Judge, filed an opinion concurring in the judgment.

Jenkins, District Judge, sitting by designation, filed an opinion concurring in judgment.

Robert N. Miller, U.S. Atty., Denver, Colo. (John O. Martin, Asst. U.S. Atty., Kansas City, Kan., with him on brief), for plaintiff-appellee.

Michael G. Katz, Federal Public Defender, Denver, Colo., for defendant-appellant.

Before BARRETT and LOGAN, Circuit Judges, and JENKINS,* District Judge.

BARRETT, Circuit Judge.

Jake Keller Neal (Neal) appeals from his jury conviction of killing a teller while robbing a savings and loan association in violation of 18 U.S.C.A. §§ 2113(a) and 2113(e). Neal does not challenge the sufficiency of the evidence. His appeal is directed exclusively to the district court's rulings on the admissibility of his wife's testimony as an immunized government witness.

On April 28, 1981, the Midland Savings and Loan of Englewood, Colorado, was robbed of $14,136 and Carla Winberg, the night teller, was killed. At that time, Neal was employed by Midland as a security guard, a position he had held for some time. Neal's wife, Marcia, had also previously worked as a Midland teller.

In December, 1981, the Englewood Police Department received a call from Marcia's daughter, Yvonne, implicating Neal in the crime. Subsequent thereto, the police recontacted[1] Marcia, who, upon being granted immunity, related Neal's commission of the crime. Shortly thereafter, Neal was arrested.

Prior to trial, the district court granted Neal's motion that certain conversations with Marcia be excluded on the basis that the introduction of the conversations would be in violation of the marital confidential communications privilege. 532 F.Supp. 942. The court conducted an *in camera* hearing on questions of preliminary admissibility of Marcia Neal's trial testimony. *See* R., Vol. II(A). In the course of this proceeding and at trial proper, Marcia Clara Neal testified under oath. The entire record of Marcia Neal's testimony discloses that: Marcia observed her husband leave their Denver home about 5:30 p.m. on April 28, 1981, (the evening of the robbery and killing) wearing gloves and drive away in his truck; Neal had completed his security guard shift at Midland at 5:00 p.m.; Neal did not return to the home until about 10:00 p.m. that evening, and shortly thereafter he entered their bedroom carrying a pink pillowcase containing a lot of money, including loose bills, wrapped coins, bills with rubber bands and bills with wrappers around them which Neal emptied from the pillowcase to the bed; the Neals were in debt and in need of money to support them-

* Honorable Bruce S. Jenkins, District Judge, Salt Lake City, Utah, sitting by designation.

1. Marcia had been interviewed by the police on several occasions immediately after the crime.

selves and Mrs. Neal's two daughters by a prior marriage who lived with them; at that time Marcia and Neal conversed about where the money came from and Neal told Marcia where it came from [R., Vol. II(A), pp. 15, 17, 19, 32]; both sat on the bed as Marcia proceeded to separate the bills in proper denominations with Neal's help; during this time they conversed again about where the money came from; after a while the money was placed back in the pillowcase; a couple of days later, Neal and Marcia took the money out of the pillowcase, and again they talked about where the money came from; at Marcia's direction, they removed wrappers off of the coins and all bands from the currency and that evening Marcia burned them over a gas range in the home and Marcia washed the ashes down the drain; Marcia also burned a large number of $50.00 bills and some $100.00 bills equaling about $1,000.00 because she knew from her prior working experience as a teller at Midland that the $50.00 bills at Midland are marked for detection and she was fearful that passing the $100.00 bills would be too noticeable [R., Vol. III, pp. 42, 81, 82]; by the end of the month following the April 28, 1981, robbery Marcia had spent all of the money remaining after the burning; her expenditures included a $3,000.00 down payment on a mobile home, $1,048.00 for purchase of a color television set, a tool box worth $149.00, car repairs amounting to $386.83; many other like expenditures were made, all with Neal's knowledge from money removed from a coffee table where Neal placed the money while they resided in the home or from an envelope placed in a waterbed after the Neals moved into the mobile home and after most of the money had been expended [R., Vol. III, p. 55]; Marcia spent much of the money for food, clothing and some $2,000.00 for her boyfriend whom she commenced to see and confide in some time after the robbery [R., Vol. III, pp. 62–64]; Marcia knew that Neal was a suspect in the Midland robbery soon after it took place because she was interviewed by two detectives, whom she permitted to search the house about two weeks after the

robbery and twice thereafter; it was Marcia's idea to spend all of the money so that it could not be detected [R., Vol. III, pp. 73, 83–85]; during the time Marcia was spending the money she was in contact with the police but she did not at any time advise them that she had spent or was spending the money [R., Vol. III, p. 85]; Marcia stated that the police suspected her when they learned of various purchases she had made, and in order to avoid the possibility of going to jail she cooperated with them in return for immunity from prosecution [R., Vol. III, pp. 86, 87]. Marcia testified on cross-examination that she lived with Neal for eight months after the robbery without revealing anything about the robbery or the money to anyone [R., Vol. III, p. 89]. At trial, Marcia, who had filed for divorce and was living with her boyfriend, was allowed to testify for the government over Neal's objection. As previously observed, she had been granted immunity by the government.

Marcia's trial testimony detailed the events following the robbery, including: observing $14,000 in cash on their bed on the evening of the robbery; the manner in which she spent the money, including $2,000 she spent on her boyfriend; her burning of the money wrappers and anything else in the house which pertained to the bank money; her burning of fifty-dollar bills which she, as a former employee of Midland, believed might be marked. In discussing her relationship with her boyfriend, Marcia testified:

Q. And, Mrs. Neal, what was the relationship between yourself and Mr. Dietz at that time?

A. Well, it started out as a working companion. He worked with me. He shared a shift with me, and we became very close, and I confided in him quite a bit, to the point that I told him about my problem, and hoping for some help to get out of my situation.

Q. And when you say you told him about your problem, what did you tell him your problem was?

A. I told him that my husband had robbed this Midland Savings and that he had killed this girl and that I was trying to get away.

[R., Vol. III at p. 64].

Neal's motion for a mistrial was denied. The district court, upon the request of Neal, declined to give the jury a cautionary instruction.

During repeated and vigorous cross-examination, Marcia acknowledged that: she was aware of the robbery on the evening it occurred but decided not to go to the police; she was repeatedly interviewed by the police but did not mention anything about receiving the money from her husband; she spent the money so it wouldn't be around because she couldn't bear to have it in her house; she cooperated with the police to avoid the possibility of going to jail; she was afforded immunity to testify; and by testifying she was doing what she had planned all along, that is, to get rid of Neal.

On appeal Neal contends that: (1) the court erred in allowing Marcia to testify about communicative acts in contravention of the marital privilege regarding confidential communications; (2) the court erred in ruling that he could be impeached if he testified by the use of prior statements in the nature of confidential communications excluded by the court in the government's case-in-chief; and (3) the court erred in refusing to grant a mistrial after Marcia testified that he had robbed the bank and killed a teller, inasmuch as this testimony was in violation of the court's own pretrial rulings prohibiting the introduction of evidence obtained from confidential communications.

We hold that Neal's contentions are without merit.

As noted, *supra,* the district court granted Neal's pre-trial motion to suppress and ruled that although Marcia could not testify relative to Neal's dumping the stolen money on their bed and his apparent conversation with her that he had robbed Midland and killed the teller, she could testify to discovering the money on their bed and

the manner in which the money was counted, hidden, and spent. We regard the district court's ruling in this respect to have been taken out of an abundance of caution. The Government, during the *in camera* hearing, argued that because Neal and Marcia had been jointly involved in a "continuing" criminal episode, even though it may not have constituted a true conspiracy, that experience and reason dictated that the marital communications privilege should not apply to prevent Marcia's testimony about the conversations she had with her husband concerning his commission of the robbery at Midland [R., Vol. II(A), pp. 42–44]. The Government also contended that when Neal gave Marcia the money with knowledge she was going to spend it, he waived the marital communications privilege. The trial court declined to find a waiver but did state that, as a practical matter, the United States Supreme Court, in *Trammel v. United States,* 445 U.S. 40, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980) may have intended to eliminate the communication privilege altogether [R., Vol. II(A), p. 45]. The Court observed the practical difficulty of keeping the explanations and communications secret and confidential while permitting evidence about acts. The court said that, in effect, testimony about *acts* and cross-examination relative thereto without explanations and communications left unanswered questions of "Where I got this, why I got this." [R., Vol. II(A), p. 45]. During the course of trial, the court, following its ruling that Neal had not waived the marital confidential communications privilege, advised the prosecution "Well, you have a quarrel with the privilege, which should be addressed to Congress. I don't agree with it either, but that's the law in this country. Address that to Congress and the Supreme Court and get it changed." [R., Vol. III, p. 92].

Marcia was an accessory after the fact to the robbery and, as such, subject to prosecution. *See, United States v. Balano,* 618 F.2d 624 (10th Cir.1979). After the government granted Marcia immunity from prosecution, she voluntarily elected to testi-

fy. Under these circumstances, we hold that her testimony was not rendered inadmissible nor in contravention of the marital privilege regarding confidential communications. In *United States v. Trammel*, 583 F.2d 1166 (10th Cir.1978), 1168, 1169, affirmed, 445 U.S. 40, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980), we stated:

> ... The federal immunity statutes, 18 U.S.C. §§ 6001–6005, represent an accommodation between the right of the Government to compel testimony on the one hand, and the constitutional privilege to remain silent, on the other. *United States v. Tramunti*, 500 F.2d 1334 (2nd Cir.1974), *cert. denied*, 419 U.S. 1079, 95 S.Ct. 667, 42 L.Ed.2d 673 (1974). The purpose of the grant of immunity is to reach the truth, and when that testimony is incriminatory, it cannot be used against the witness. The Congressional intent, then, is that the statutory claim of immunity be as broad as, but no broader than, the privilege against self-incrimination. *Childs v. McCord*, 420 F.Supp. 428 (D.C.Md.1976), affirmed, 556 F.2d 1178 (4th Cir.1977).

■■ *A defendant has no standing to contest the propriety of the grant of immunity to a witness. United States v. Rauhoff*, 525 F.2d 1170 (7th Cir.1975). Otis Trammel, as a defendant, thus was without standing to challenge the grant of immunity to his wife, Elizabeth, unless the privilege asserted by reason of the marital relationship is such that the rule of "reason and experience" mandates that the privilege asserted overrides the grant. We hold that it does not. ... *We hold that, to like effect, a defendant husband who has jointly participated in a criminal conspiracy with his wife cannot prevail upon his claim of the marital privilege when his wife gives incriminating testimony under grant of immunity.* [Emphasis supplied].

In affirming our decision the Supreme Court opined:

> ... *When one spouse is willing to testify against the other in a criminal proceeding—whatever the motivation—their relationship is almost certainly in disrepair; there is probably little in the way of marital harmony for the privilege to preserve. In these circumstances, a rule of evidence that permits an accused to prevent adverse spousal testimony seems far more likely to frustrate justice than to foster family peace.* Indeed, there is reason to believe that vesting the privilege in the accused could actually undermine the marital relationship. For example, in a case such as this, the Government is unlikely to offer a wife immunity and lenient treatment if it knows that her husband can prevent her from giving adverse testimony. *If the Government is dissuaded from making such an offer, the privilege can have the untoward effect of permitting one spouse to escape justice at the expense of the other.* It hardly seems conducive to the preservation of the marital relation to place a wife in jeopardy solely by virtue of her husband's control over her testimony.

## IV

Our consideration of the foundations for the privilege and its history satisfy us that "reason and experience" no longer justify so sweeping a rule as that found acceptable by the Court in *Hawkins*. Accordingly, *we conclude that the existing rule should be modified so that the witness-spouse alone has a privilege to refuse to testify adversely; the witness may be neither compelled to testify nor foreclosed from testifying.* This modification—vesting the privilege in the witness-spouse—furthers the important public interest in marital harmony without unduly burdening legitimate law enforcement needs.... [Emphasis supplied].

445 U.S. at pp. 52–53, 100 S.Ct. at 913–914. (Footnotes omitted).

■ In the instant case, Marcia, as an accessory after the fact to the robbery, was subject to prosecution. *See, United States v. Balano*, 618 F.2d 624 (10th Cir. 1979). She became an accessory after the

fact, in our view, concurrent with Neal's act of emptying the pillowcase filled with money to the bed and his explanation of where the money came from. At that particular time, Marcia did not then recognize any marked bills nor was she aware of the source of the money *except* for and by reason of Neal's remarks that he had robbed Midland. It is our view the marital communication privilege does operate to prevent the testimony of one spouse against another if the *sole* knowledge and information and/or participation *involves a conversation wherein the spouse who committed the crime discloses that fact to the other spouse.* In such a case, the only connection the one spouse could have with the crime would be the statement by the other spouse that he or she committed the crime. If, however, such as in the instant case, the spouse who did not conspire to or participate in the commission of the crime nevertheless thereafter, with knowledge of the fact that the other spouse did commit the crime, actively, by overt acts, participates in the "fruits" of the crime or "covers up" evidence thereof by any means, then the marital communication privilege does not apply to protect the spouse who committed the crime from voluntary incriminating testimony of his spouse who actively participated as an accessory-after-the-fact. Thus, we would apply the "crime-fraud" exception recognized by various courts in those cases where the husband and wife engaged in a criminal conspiracy to those cases where one spouse commits a crime and the other spouse thereafter actively participates in the fruits thereof or engages in overt acts to "cover up" the commission of the crime. We do not here decide whether, in accessory-after-the-fact cases, there may be a basis for limiting the testimony of the spouse who becomes an accessory-after-the-fact to that which was said and that which occurred after the non-principal spouse first actively participated in the fruits of the crime or actively engaged in a cover-up, with prior knowledge of the fact that the opposite spouse committed the principal crime. We are inclined, without here deciding, to the view that the only exception to denial of admissibility of testimony of the accessory-after-the-fact spouse relative to all admissions or statements made by the spouse who committed the principal crime involves a situation where the accessorial spouse is involved *only* to the extent of knowledge gained by virtue of the admission.

 We agree with those courts which have applied the "crime-fraud" exception in criminal conspiracy cases to the marital communications privilege. These opinions hold that when a husband and wife conspire or otherwise actively participate in an agreement for an unlawful end, they form a "partnership in crime" and extrajudicial statements made in furtherance of the criminal activity may, by consent of the witness-spouse, be used against the other. These opinions, in effect, stand for the proposition that if the participation or act is both testimonial and physical, the marital communications privilege does not apply. One opinion holds that marital communications having to do with the commission of crime and not with the privacy of the marriage itself do not fall within the privilege's protection. *United States v. Kahn,* 471 F.2d 191 (7th Cir.1972), *cert. denied,* 411 U.S. 986, 93 S.Ct. 2271, 36 L.Ed.2d 964 (1973), *rev'd on other grounds,* 415 U.S. 143, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974). The court there stated, *inter alia:*

> If the intercepted conversations [between husband and wife] had to do with the commission of a crime and not with the privacy of the Kahn marriage, the judge's ruling (denying admission of the conversation on the basis of the marital communication privilege) is erroneous. Society has an interest in protecting the privacy of marriage because invasion of the privacy endangers the family relationship ... "[w]here both spouses are substantial participants in patently illegal activity, even the most expansive of the marriage privileges should not prevent testimony." [footnotes omitted].

471 F.2d at 194.

In *United States v. Price,* 577 F.2d 1356 (9th Cir.1978), *cert. denied,* 439 U.S. 1068,

99 S.Ct. 835, 59 L.Ed.2d 33 (1978), the witness-spouse's husband was prosecuted for transportation of women in interstate commerce for purposes of prostitution. The court held that where the husband and wife are engaged in a criminal conspiracy, extrajudicial statements of either made in furtherance of the conspiracy may be admitted against the other. The court agreed with Judge Learned Hand's observation that when a husband and wife become involved in a partnership of crime what one does or says pursuant to a common purpose, all do. *See also, United States v. Mendoza,* 574 F.2d 1373 (5th Cir.1978), *cert. denied,* 439 U.S. 988, 99 S.Ct. 584, 58 L.Ed.2d 661 (1978) (a crime in which the husband and wife were jointly involved did not prevent admission of conversations between them relative thereto, notwithstanding the marital communications privilege).

The Supreme Court, in *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), cautioned that all privileges should be construed narrowly. They are in derogation of the search for truth. Fed.R.Evid. 501 contains a congressional mandate that a privilege must be interpreted in the light of reason and experience. Thus, in *United States v. Entrekin,* 624 F.2d 597 (5th Cir.1980), *cert. denied,* 451 U.S. 971, 101 S.Ct. 2049, 68 L.Ed.2d 350 (1981), the court, while recognizing that confidential marital communications remain privileged after *Trammel, supra,* indicated that the privilege does not apply where the conversations between the husband and wife were made in furtherance of conspiracy to commit mail fraud.

In summary, we hold that conversations between husband and wife about crimes in which they conspire or participate or, after the fact, participate in, are not privileged marital communications for the purpose of protection as confidential marital communications.

WE AFFIRM.

LOGAN, Circuit Judge, concurring:

I concur in the judgment affirming the defendant's conviction, but I would reach that result by a different route.

The privilege against adverse spousal testimony and the privilege for confidential marital communications are closely related; both are intended to encourage "marital confidences, which confidences in turn promote harmony between husband and wife." *McCormick's Handbook of the Law of Evidence,* § 86, at 172 (E. Cleary 2d ed. 1972). In *Trammel v. United States,* 445 U.S. 40, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980), the Supreme Court limited the privilege against adverse testimony to make it available only at the option of the testifying spouse. Arguably, the reasoning of that opinion undercuts the rule protecting confidential marital communications and presages a similar limitation or the demise of that rule. I also acknowledge that some commentators question whether the confidential communications rule effectively serves its purpose. *See, e.g., McCormick's Handbook of the Law of Evidence* § 86, at 172–73; Preliminary Draft of Proposed Rules of Evidence for the United States District Courts and Magistrates, Rule 5-05, 46 F.R.D. 161, 264–65 (1969). However, in *Trammel* the Supreme Court recognized the rule's continued existence. 445 U.S. at 45 n. 5, 51, 100 S.Ct. at 909 n. 5, 912. This Court also has acknowledged that the confidential marital communications privilege survived *Trammel. United States v. Crouthers,* 669 F.2d 635, 641–42 (10th Cir. 1982).

Other circuits, although recognizing that the confidential marital communications privilege exists, have held it inapplicable when a husband and wife engage in joint criminal activity. *E.g., United States v. Ammar,* 714 F.2d 238, 258 (3d Cir.), *cert. denied sub nom. Stillman v. United States,* —— U.S. ——, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983); *United States v. Price,* 577 F.2d 1356, 1364–65 (9th Cir.), *cert. denied sub nom. Mitchell v. United States,* 439 U.S. 1068, 99 S.Ct. 835, 59 L.Ed.2d 33 (1979); *United States v. Mendoza,* 574 F.2d 1373 (5th Cir.), *cert. denied,* 439 U.S. 988, 99 S.Ct. 584, 58 L.Ed.2d 661 (1978); *United States v. Kahn,* 471 F.2d 191, 194–95 (7th

Cir.1972), *cert. denied*, 411 U.S. 986, 93 S.Ct. 2271, 36 L.Ed.2d 964 (1973), *rev'd on other grounds*, 415 U.S. 143, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974).

If carried to its logical conclusion the crime-fraud exception would effectively abolish the marital communication privilege. In the case before us, for instance, the wife actively assisted her husband in covering up the murder and robbery and thus was an accessory. Colo.Rev.Stat. § 18–8–105. An early case in Colorado held that when a husband simply confessed to his wife that he had committed a crime and she failed to report it, she would not be guilty of a crime. *See Lowe v. People*, 135 Colo. 209, 309 P.2d 601 (1957). Since that case, however, Colorado has passed an act imposing a duty on everyone to report crimes, with an exception for "any communication privileged by law." Colo.Rev.Stat. § 18–8–115. Moreover, other specific criminal statutes might place a spouse's failure to report outside the marital communication privilege. *See id.* § 18–8–107 (refusing to aid a peace officer); § 18–8–109 (concealing death). It is difficult to predict what the courts may regard as aid to the criminal spouse; a court could characterize the suppression of nearly any communication by a spouse concerning criminal activity as a crime itself that thus falls within the crime-fraud exception.

I would not adopt a crime-fraud exception to the privilege for confidential marital communications for several reasons. First, I do not think we are free to abolish or modify a rule the Supreme Court has explicitly recognized within the past four years. Second, even if we were free to abolish, modify, or create exceptions to the rule, in view of its ancient lineage I would require persuasive evidence of the need before making a change. No one has presented such evidence. Finally, I see problems in creating a crime-fraud exception or even in making the privilege available only at the option of the testifying spouse or ex-spouse. Prosecutors will be tempted to threaten the spouse they deem less culpable and offer reduced charges or immunity for testimony that will convict but destroy the marriage. Additionally, the reliability of the spousal testimony might be questionable. Confidential communications, by definition, are conversations with only the spouses present. The spouse charged with the crime must surrender the constitutional right not to testify at his or her criminal trial, with all its attendant consequences, in order to refute the other's testimony. And, particularly if the marriage has ended in divorce, the testifying ex-spouse may be tempted to lie or to stretch the truth.

We do not have to adopt a crime-fraud exception or modify the rule in any way in order to affirm the conviction in the instant case. I believe the trial court properly applied the privilege for confidential marital communications. The privilege applies only to confidential communications. Certainly, confidential communications include words exchanged between spouses. They also include physical acts that are entirely communicative, such as sign language. However, many acts have both a testimonial and a non-testimonial aspect. Although the line is extremely difficult to draw, the situation is analogous to that in which courts must decide whether blood and handwriting samples, physical presence in line-ups, and other evidence that may incriminate violate the privilege against self-incrimination. I am satisfied that the spouse's statements in the instant case, which included references to her own actions in burning bills, secreting money and spending it, did not violate the confidential communication privilege.

On the impeachment issue, I believe that *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), supports the trial court's ruling that otherwise inadmissible testimony involving the marital communication privilege can be used to impeach a defendant who testifies on his own behalf. *See United States v. Benford*, 457 F.Supp. 589 (E.D.Mich.1978).

I also agree that the wife's testimony that she told her boyfriend her husband had killed a woman and robbed a bank does

not require a reversal. Her statement was only relevant to prove that defendant had killed a woman and robbed a bank. But the wife had no first-hand knowledge of that fact. Fed.R.Evid. 602. If defendant had told his wife that he had killed a woman and robbed a bank, her testimony about this admission would not be hearsay, Fed. R.Evid. 801(d)(2)(A), but would violate the confidential marital communications privilege. The government suggests that the wife's testimony was proper because it was simply her opinion. Her opinion, however, is not competent evidence. Nonetheless, I agree that the improper testimony did not justify a mistrial in light of the overwhelming weight of the other competent evidence.

For the reasons stated above I concur in the judgment affirming the conviction.

JENKINS, District Judge, concurring:

I concur in the judgment of the court that the conviction of Neal should be affirmed. My reasons are set forth below.

The application of a Crime/Fraud exception to the usual privilege against the disclosure by a spouse-witness of an asserted confidential marital communication assumes that that which was testified to was such a confidential marital communication which, but for the exception, would ordinarily be excluded as privileged at the instance of the defendant. That which would ordinarily be kept out because of defendant's privilege is admitted into evidence because of the exception.

This is merely an alternative way of describing the boundary of the traditional rule against the disclosure in a Court of Law of a confidential marital communication when a defendant doesn't want it disclosed, purportedly for the public policy reason of preserving a marital relationship which in most instances has long since vanished or to encourage other couples not involved in the case to communicate well one with another. The twin facets of the rule suggested by the court—the privilege and the Crime/Fraud exception—assume the existence in fact of a confidential marital communication.

In my opinion, the testimony in this case, even though that of an estranged spouse who was an immunized government witness, was not spousal testimony which disclosed a confidential marital communication. The witness simply described what she saw. While I recognize that one can communicate using various means, and that showing may be equally informative as telling, it seems to me that the privilege has been historically applied to that which was told to a spouse by words and not to acts or deeds observed by a spouse.

Thus, neither the application of the rule against the disclosure of a confidential marital communication—whatever remains of that privilege since *Trammel v. United States*, 445 U.S. 40, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980), nor the application of a suggested Crime/Fraud exception to such rule is required.

The court simply need not reach that question.

I would have no trouble with the application of a Crime/Fraud exception to an appropriate accessory-after-the-fact case as one way of describing the boundary of what remains of the privilege. A preferable way in my view would be to affirmatively describe what vestige of the historical practice remains—not by describing what is excepted from it, but by describing what is included in it. The method used is much like describing a quarter of an apple by saying it is a whole apple less three-fourths. Such, however, is more a matter of style than of substance. Either description is accurate.

The important thing in this case is that the testimony received did not disclose a confidential marital communication. One need go no further.

As to the remaining issues, I concur in the opinion of Judge Barrett.