**In re GRAND JURY 85–1.**

**UNITED STATES of America, Plaintiff,**

v.

**Evelyn SHELLEDA, Defendant.**

United States District Court, D. Colorado.

April 21, 1987.

Gerald Rafferty, Asst. U.S. Atty., Denver, Colo., for plaintiff.

William A. Cohan, Darold W. Killmer, Denver, Colo., for defendant.

## MEMORANDUM OPINION AND ORDER

SHERMAN G. FINESILVER, Chief Judge.

On November 10, 1986, defendant Evelyn Shelleda was served with Grand Jury Subpoena No. 6339, which ordered her to appear before Grand Jury 85–1. Grand Jury 85–1 is investigating violations of federal laws, including the submission of false income tax returns. The subpoena in question directs Mrs. Shelleda to provide handwriting and fingerprint exemplars. The government maintains that both Mrs. Shelleda and her husband, Edmond Shelle-da, are subjects of inquiry by the grand jury investigation.

On November 24, 1986, Mrs. Shelleda moved the Court to quash the subpoena on any of three bases: (1) her privilege not to be compelled to provide adverse evidence against her spouse; (2) her fifth amendment privilege; and (3) her assertion that the subpoena was derived from illegal surveillance by the government. By Order dated December 22, 1986, we rejected both the fifth amendment argument and the allegation of illegal surveillance, and denied the motion to quash.

Mrs. Shelleda continued to refuse compliance with the subpoena, however, maintaining that the marital privilege protected her from doing so. On the government's petition, we issued an Order to Show Cause why Mrs. Shelleda should not be held in contempt for not complying with the subpoena. At the Show Cause Hearing on April 10, 1987, counsel for Mrs. Shelleda argued that the marital privilege was not limited to matters which are "testimonial", but should apply as well to physical evidence tending to reflect adversely on a spouse. We ordered both parties to submit memoranda of law discussing the marital privilege issue.

Succinctly stated, we hold that the privilege against adverse spousal testimony does not extend to nontestimonial evidence such as fingerprints and handwriting.

### I.

Federal courts interpret privileges by reference to the common law and "in light of reason and experience." Fed.R.Evid. 501. Marital privileges have developed in the common law along two distinct lines. One privilege allows either spouse to prevent the other from testifying as to any confidential communications which occurred during a valid marriage. *See e.g. United States v. Neal*, 743 F.2d 1441 (10th Cir.1984); *United States v. Kapnison*, 743 F.2d 1450 (10th Cir.1984). The other privilege permits the witness spouse to refuse to testify adversely against the nonwitness spouse. Significantly, the privilege extends only to the *witness* spouse. *Tram-*

*mel v. United States*, 445 U.S. 40, 53, 100 S.Ct. 906, 914, 63 L.Ed.2d 186 (1980). This principle is commonly referred to as the adverse spousal testimonial privilege.

The latter privilege, at issue in this case, has had a distinct evolution in common law. The privilege "flowed from two tenets of medieval jurisprudence: first, that a wife had no legal identity independent of her husband's, and second, that an accused could not testify on his own behalf". *Id.* at 44, 100 S.Ct. at 909. The champion of the common law, Sir Edward Coke, wrote that "it hath been resolved by the Justices that a wife cannot be produced either against or for her husband". 1 *E. Coke, A Commentarie upon Littleton* 6b (1628). The privilege has been roundly criticized by commentators. *See* 8 *Wigmore on Evidence* § 2228, at 221 (McNaughton rev. 1961) ("In an age which has so far rationalized, depolarized and dechivalrized the marital relation and the spirit of femininity as to be willing to enact complete legal and political equality and independence of man and woman, this marital privilege is the merest anachronism in legal theory and an indefensible obstruction to truth in practice."); C. McCormick, *Evidence* § 66, at 162–63 (3d ed. 1984) ("The privilege is an archaic survival of a mystical religious dogma and of a way of thinking about the marital relation that is today outmoded."); *see also Trammel v. United States*, 445 U.S. 40, 50 n. 11, 100 S.Ct. 906, 912 n. 11, 63 L.Ed.2d 186 (1980). In 1980, the Supreme Court limited the availability of the privilege, stating:

> [W]e conclude that the existing rule should be modified so that the witness-spouse alone has a privilege to refuse to testify adversely; the witness may be neither compelled to testify nor foreclosed from testifying. This modification—vesting the privilege in the witness-spouse—furthers the important public interest in marital harmony without unduly burdening legitimate law enforcement needs.

*Trammel v. United States*, 445 U.S. 40, 53, 100 S.Ct. 906, 914, 63 L.Ed.2d 186 (1980). Significantly, the Court spoke only of protecting a spouse's desire to *testify*.

## II.

The question whether the adverse spousal testimonial privilege extends to nontestimonial evidence is one of first impression in this Circuit. It is well settled that the compelled provision of handwriting and fingerprint exemplars is a nontestimonial act, unprotected by the fifth amendment privilege against self-incrimination. *Gilbert v. California*, 388 U.S. 263, 266–67, 87 S.Ct. 1951, 1953–54, 18 L.Ed.2d 1178 (1967). Relatively recently, the Supreme Court addressed the dichotomy of testimonial and nontestimonial evidence:

> The scope of the "testimonial" or evidentiary duty imposed by common law or statute has traditionally been interpreted as an expansive duty limited principally by relevance and privilege. As this Court described the contours of the duty in *United States v. Bryan*, 339 U.S. 323, 331, 70 S.Ct. 724, 730, 94 L.Ed. 884 (1950): "[P]ersons summoned as witnesses by competent authority have certain minimum duties and obligations which are necessary concessions to the public interest in the orderly operation of legislative and judicial machinery.... We have often iterated the importance of this public duty, which every person within the jurisdiction of the Government is bound to perform when properly summoned." While the Court recognized that certain exemptions would be upheld, the "primary assumption" was that a summoned party must "give what testimony one is capable of giving" absent an exemption "grounded in a substantial individual interest which has been found, through centuries of experience, to outweigh the public interest in the search for truth." *Ibid.*

One application of this broad duty to provide relevant evidence has been the recognition, since early times, of an obligation to provide certain forms of nontestimonial evidence. In *Holt v. United States*, 218 U.S. 245, 252–53, 31 S.Ct. 2, 6, 54 L.Ed. 1021 (1910) (Holmes, J.), the Court found that the common-law evidentiary duty permitted the compulsion of

various forms of physical evidence. In *Schmerber v. California,* 384 U.S. 757, 764, 86 S.Ct. 1826, 1832, 16 L.Ed.2d 908 (1966), this Court observed that traditionally witnesses could be compelled, in both state and federal courts, to submit "fingerprinting, photographing, or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture." *See also United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). In *Gilbert v. California,* 388 U.S. 263, 266–67, 87 S.Ct. 1951, 1953, 18 L.Ed.2d 1178 (1967), handwriting was held, "like the ... body itself" to be an "identifying physical characteristic," subject to production. In *United States v. Dionisio,* 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973) and *United States v. Mara,* 410 U.S. 19, 93 S.Ct. 774, 35 L.Ed.2d 99 (1973), this Court again confirmed that handwriting is in the nature of physical evidence which can be compelled by a grand jury in the exercise of its subpoena power. *United States v. Euge,* 444 U.S. 707, 712–13, 100 S.Ct. 874, 878–79, 63 L.Ed.2d 141 (1980). Hence, the nontestimonial, and thus nonprivileged, nature of the exemplars sought by Grand Jury 85–1 is clear, at least in the context of the fifth amendment. *Cf. United States v. Delaplane,* 778 F.2d 570, 575 (10th Cir.1985), *cert. denied,* —— U.S. ——, 107 S.Ct. 104, 93 L.Ed.2d 54 (1986); *In re Grand Jury Proceedings (Vargas),* 727 F.2d 941, 944 (10th Cir.), *cert. denied sub nom., Vargas v. United States,* 469 U.S. 819, 105 S.Ct. 90, 83 L.Ed.2d 37 (1984).

### III.

■ We must decide whether the privilege against adverse spousal testimony is, like the fifth amendment privilege against self-incrimination, inapplicable to nontestimonial evidence.

Mrs. Shelleda contends that "[t]he application of Fifth Amendment principles in the context of the marital privilege would be a *synecdochic* or *metonymic* [1] misconstruction of separate and distinct principles, one deriving from the common law and one constitutionally based". Memorandum Showing Cause Why Defendant Should Not Be Held in Contempt of Court, at 2 (emphasis added). We perceive no distinction between the two privileges, however, which mandates against limiting the scope of the marital privilege to nontestimonial evidence.

The privilege against self-incrimination is of ancient biblical origin.[2] Its early influence extended to the medieval ecclesiastical courts of England, and spread to America with the adoption of English common law.[3] On December 15, 1791, Congress ratified the first ten amendments to the United States Constitution, which became known as the Bill of Rights. By virtue of its inclusion in the fifth amendment, the privi-

---

**1.** The terms "synecdochic" and "metonymic", appearing in movant's brief, are not words of general use and dictionary reference is necessary. A "synecdochic" expression is a figure of speech by which a word representing a large group is used instead of a word representing a smaller group, or vice versa. A "metonymic" expression is a figure of speech by which the name of one thing is substituted for the name of something else with which it is associated. *Webster's Third New International Dictionary* 2320, 1424 (16th ed. 1971).

**2.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), traces this early history, stating: "Thirteenth century commentators found an analogue to the privilege grounded in the Bible. 'To sum up the matter, the principle that no man is to be declared guilty on his own admission is a divine decree.' Maimonides, Mishneh Torah (Code of Jewish Law),

Book of Judges, Laws of the Sanhedrin, c. 18, ¶ 6, III Yale Judaica Series 52–53. See also Lamm, The Fifth Amendment and Its Equivalent in the Halakhah, 5 Judaism 53 (Winter 1956)." *Id.* at 458 n. 27, 86 S.Ct. at 1619 n. 27.

**3.** Prior to the seventeenth century, the privilege against self-incrimination was available only in the ecclesiastical courts. 8 *Wigmore on Evidence* § 2250, at 270–84 (McNaughton rev. 1961). Sir Edward Coke was the first to extend the privilege to common law courts. *Id.* at 287 (referring to *Hinde's Case* (1558) and *Leigh's Case* (1568), cited by Coke, 12 Rep. 27, 3 Bulst. 49). By the mid-1600s, the privilege was fully adopted by common law courts. *See Lilburn's Trial,* 4 How.St.Tr. 1269, 1280, 1292, 1342, 1445 (1649); *King Charles' Trial,* 4 How.St.Tr. 993, 1101 (1649); *Twelve Bishops' Trial,* 4 How.St.Tr. 63, 75 (1641).

**200**

lege against self-incrimination became part of the body of American constitutional law.[4] The privilege is one that is constitutionally sanctioned by common law. The fact that the privilege was incorporated into the Bill of Rights does not trivialize its common law roots. The fact that other common law privileges were not incorporated into the Bill of Rights implies that they were deemed to be less important than the privilege against self-incrimination.

To hold that the privilege against self-incrimination does not apply to nontestimonial evidence, but the privilege against adverse spousal testimony does apply, would be an illogical construction of the two common law privileges. The privilege against self-incrimination has been limited in its invocation to testimonial acts. As discussed above, the Supreme Court has refused to extend the privilege against self-incrimination to nontestimonial acts, such as the provision of handwriting and fingerprint exemplars. In *Trammel*, the Court noted:

> Testimonial exclusionary rules and privileges contravene the fundamental principle that " 'the public ... has a right to every man's evidence.' " *United States v. Bryan*, 339 U.S. 323, 331, 70 S.Ct. 724, 730, 94 L.Ed. 884 (1950). As such, they must be strictly construed and accepted "only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth." *Elkins v. United States*, 364 U.S. 206, 234, 80 S.Ct. 1437, 1454, 4 L.Ed.2d 1669 (1960) (Frankfurter, J., dissenting).

*Trammel v. United States*, 445 U.S. 40, 50, 100 S.Ct. 906, 912, 63 L.Ed.2d 186 (1980). After analyzing its common law roots and its continuing viability, the Court in *Trammel* restricted the scope of the adverse spousal testimonial privilege. Considering that the privilege against self-incrimination does not apply to nontestimonial acts, and that the privilege against adverse spousal testimony has been scaled back to avoid "unduly burdening legitimate law enforcement needs", *id.* at 53, 100 S.Ct. at 914, we hold that the adverse spousal testimonial privilege does not apply to nontestimonial acts, such as handwriting and fingerprint exemplars.[5] Thus there must be compliance by Evelyn Shelleda pursuant to Grand Jury Subpoena No. 6339.

We need not address the government's argument regarding the "joint participants" exception to the marital privileges. *See e.g., United States v. Neal*, 743 F.2d 1441, 1446 (10th Cir.1984), *cert. denied*, 470 U.S. 1086, 105 S.Ct. 1848, 85 L.Ed.2d 146 (1985); *United States v. Clark*, 712 F.2d 299, 301 (7th Cir.1983).

ACCORDINGLY, the Motion to Quash is DENIED. It is

ORDERED that Evelyn Shelleda shall appear before Grand Jury 85–1 and provide handwriting and fingerprint exemplars on Thursday, April 23, 1987 at 8:30 a.m. Failure to comply will be grounds for sanctions as provided by law.

---

**4.** The fifth amendment states, "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; *nor shall be compelled in any criminal case to be a witness against himself*, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." U.S.Const. Amend. V (emphasis added).

**5.** Courts that have addressed the precise issue before us today are in general agreement on this principle. *See United States v. Scott*, 784 F.2d 787, 792–93 (7th Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 2257, 90 L.Ed.2d 702 (1986); *United States v. McKeon*, 558 F.Supp. 1243, 1246 (E.D. N.Y.1983); *In re Clark*, 461 F.Supp. 1149, 1150 (S.D.N.Y.1978); *In re Grand Jury Proceedings (Rovner)*, 377 F.Supp. 954, 955 (E.D.Pa.), *aff'd*, 500 F.2d 1400 (1974).