791 So.2d 44 (2001)
Bernice BOWEN, Appellant,
v.
STATE of Florida, Appellee.
No. 2D99-3125.
District Court of Appeal of Florida, Second District.
June 8, 2001.
Rehearing Denied August 8, 2001.
*47 Claude H. Tison, Jr., of The Swope Law Group, Tampa, for Appellant.
Robert A. Butterworth, Attorney General, Tallahassee, and Wendy Buffington, Assistant Attorney General, Tampa, for Appellee.
ALTENBERND, Judge.
Bernice Bowen appeals her convictions as an accessory after the fact to five crimes: (1) the manslaughter of her four-year-old son, Joey Bennett; (2) an escape; (3) the first-degree murder of Tampa Police Detective Ricky Childers; (4) the first-degree murder of Tampa Police Detective Randy Bell; and (5) the first-degree murder of Florida Highway Patrol Trooper James Crooks. All of the underlying crimes were alleged to have been committed by Ms. Bowen's live-in boyfriend, Hank Carr, a/k/a Joseph Bennett, a/k/a *48 James Earl Reed, a/k/a Eric Weaver, a/k/a "Boo." Although the information that the State filed against Ms. Bowen contained no specific allegations describing the assistance Ms. Bowen allegedly gave to Carr following these crimes, the State prosecuted her as an accessory after the fact primarily because she failed to provide Carr's correct legal name during interviews following the death of her son and because she failed to volunteer that Carr often carried a handcuff key on his person. We reverse.
As to the charge of accessory after the fact for the manslaughter of her son, we conclude that the State failed to prove that a manslaughter occurred and that Ms. Bowen had actual knowledge that a manslaughter had occurred when she gave any assistance to Carr. As to the charge of accessory after the fact to the murder of Trooper Crooks, we conclude that the State failed to prove that Ms. Bowen had actual knowledge that Carr had committed this crime during the period when she gave any assistance to Carr. Accordingly, she is entitled to a judgment of acquittal on these charges.
We conclude that the State did present a prima facie case concerning the charges of accessory after the fact to escape and to the murder of the two detectives. However, a new trial is required on these charges because Ms. Bowen's defense for these charges was prejudiced by trying them together with the charge for accessory after the fact to manslaughter. The State used the charge of accessory after the fact to manslaughter to emphasize that Carr possessed a handcuff key and to argue that Ms. Bowen's failure to disclose this fact made her responsible for the crimes occurring thereafter. A feature of the trial became what Ms. Bowen could have done to prevent the crimes, not her criminal responsibility for aiding Carr after the crimes were committed.
This appeal does not involve Ms. Bowen's convictions for child abuse in an unrelated case. Thus, this opinion does not reverse the sentences totaling fifteen years' incarceration that she received after entering a plea on those charges.

I. THE BASIC FACTS[1]
On May 19, 1998, at approximately 9:30 a.m., Ms. Bowen's son Joey sustained a fatal gunshot wound to his head while inside a Tampa apartment that Ms. Bowen shared with Hank Carr. At the time, Carr was the subject of outstanding marijuana trafficking charges in Ohio, and Ms. Bowen knew this. The couple had been living in Tampa for about two years, and Carr had been using aliases, including the name "Joseph Bennett." Ms. Bowen was the ex-wife of a man named Joseph Bennett, and her young son was his namesake.
As soon as the shooting occurred, the couple took the dying boy to a fire station. Police officers at the fire station began to ask questions. When the boy died, Carr immediately left the fire station while the officers ordered him to stop. He went back to the apartment, leaving Ms. Bowen at the fire station. He was apprehended by the police at the apartment and taken to the police station for questioning by Detectives Childers and Bell. Although Carr was placed in handcuffs, it is not clear if he was formally arrested. Ms. Bowen, who clearly was grief-stricken over the loss of her child, was taken separately to the police station. Sometime after 1 p.m., Detectives Childers and Bell took Carr back to the apartment to have him explain what happened there. On the way back to the station, around 2 p.m., Carr *49 apparently used a handcuff key to escape from the two officers. He shot and killed both of them. He then hijacked a pickup truck and headed north from Tampa on Interstates 275 and 75. About twenty-five miles north of Tampa, at approximately 2:30 p.m., Carr shot and killed Trooper Crooks, who was pursuing him. Around 3 p.m., after sustaining a gunshot wound, Carr holed up in a gas station about fifty miles north of Tampa, taking the clerk hostage. He was immediately surrounded by many law enforcement officers. Carr told his version of the story over the telephone to a local radio station, and after releasing the hostage, he killed himself around 7:30 p.m.
Ms. Bowen was generally cooperative with the police after her son died. Although she may have been calm enough to deceive the police about some specific facts, there is little question that she was genuinely distraught at the traumatic death of her son. She signed a consent form to allow her apartment to be searched and gave three taped statements to the police, the first occurring around 12:30 p.m. She was aware that Carr owned a handcuff key and that he often kept it on his person, but she did not volunteer this information. It is unclear whether she ever saw Carr in handcuffs or otherwise knew that he had been handcuffed.
Prior to the death of the two detectives, Ms. Bowen never identified Carr as Hank Carr. The evidence supports an inference that she knew the police would discover an Ohio warrant if she gave his correct name and that she withheld his name to prevent his arrest on this charge. Between 2 and 2:30 p.m., a detective informed Ms. Bowen that Carr had killed two detectives. Ms. Bowen was brought into a room and asked to give a detective any name Carr may have been arrested under, so that the officer could search Hillsborough County arrest records for a picture. Ms. Bowen provided the detective with various names for Carr, including a first name of "Hank" and a last name of "Carr," but the detective testified she did not place the names "Hank" and "Carr" together. Around 2:30 p.m., Ms. Bowen gave the detective the correct name and Tampa address of Carr's mother, and officers were dispatched to that address. At 3:30 p.m., Ms. Bowen gave a second taped statement in which she indicated that Carr was also known as Hank Carr. She then agreed to go to the gas station to talk to Carr, in part to secure the release of the hostage. At the end of the day, she provided a third taped statement and was allowed to return home. A few days later, however, she was arrested and charged as an accessory after the fact to Carr's various crimes.

II. THE BASIC LAW OF ACCESSORY AFTER THE FACT[2]
Because three law enforcement officers were senselessly murdered by Carr, this case attracted considerable public and media attention. Many people hold Ms. Bowen morally responsible for the deaths of these officers. From a moral perspective, there is no question that Ms. Bowen must always share a portion of the blame for the death of her son and for the murders of three fine officers. Morally, she might have been able to take earlier action to prevent these deaths.
From a legal perspective, it is important to understand that the State did not claim that Ms. Bowen was criminally responsible for these deaths. It did not charge Ms. *50 Bowen as a principal to these crimes or as an accessory before the factnor is there evidence to support such charges. In addition, the law does not hold Ms. Bowen criminally responsible for failing to prevent the crime of another, or merely for failing to report it. Instead, the State charged Ms. Bowen as an accessory after the fact to three separate criminal episodes involving the four deaths. It is helpful to consider some of the basic requirements and limitations of this criminal offense before examining the evidence in detail to determine whether the State proved its case against Ms. Bowen.
Section 777.03(1), Florida Statutes (1997), defines the crime of accessory after the fact as follows:
Any person not standing in the relation of husband or wife, parent or grandparent, child or grandchild, brother or sister, by consanguinity or affinity to the offender, who maintains or assists the principal or accessory before the fact, or gives the offender any other aid, knowing that the offender had committed a felony or been accessory thereto before the fact, with intent that the offender avoids or escapes detection, arrest, trial or punishment, is an accessory after the fact.
The degree of the crime of accessory after the fact is linked to the degree of the underlying crime of the principal, generally being one degree below the principal's crime. § 777.03(2), Fla. Stat. (1997).
This crime has five basic elements, as set out in the standard jury instruction. Fla. Std. Jury Instr. (Crim.) 73.[3] In this case, for each crime, the State essentially needed to prove that (1) the crime was committed by Carr; (2) Ms. Bowen knew Carr had committed the crime; (3) Ms. Bowen thereafter "maintained, assisted or gave any other aid" to Carr; (4) Ms. Bowen gave the aid with the intent that Carr avoid or escape arrest; and (5) Ms. Bowen was not related to Carr by blood or marriage. As can be seen in these elements, the timing of events and the knowledge and intent of the defendant at specific times are critical aspects of a prosecution for this crime. In this case, the only element that was undisputed was that Ms. Bowen was not related to Carr.[4] Therefore, we discuss the other four elements.

1. Proof of the Underlying Crime.

Because the crime of accessory after the fact requires an intent to assist a person who has committed a felony, the crime is separate and distinct from the crime committed by the principal. Staten v. State, 519 So.2d 622 (Fla.1988). Thus, a person cannot be convicted as both a principal in a crime and as an accessory after the fact to the same crime, and the crime of accessory after the fact cannot arise until the underlying crime is complete. Id. See also Jackson v. State, 543 So.2d 416 (Fla. 5th DCA 1989); Newkirk v. State, 222 So.2d 435 (Fla. 3d DCA 1969); Baker v. State, 184 Tenn. 503, 201 S.W.2d 667 (1947).
The fact that Carr committed suicide and was never prosecuted does not bar Ms. Bowen's prosecution, but the State is obligated in her case to prove, beyond a reasonable doubt, that Carr committed the *51 offense alleged in each count. See Brown v. State, 672 So.2d 861 (Fla. 3d DCA 1996); F.M. v. State, 622 So.2d 71 (Fla. 2d DCA 1993). But see McKnight v. State, 658 N.E.2d 559 (Ind.1995) (holding conviction for accessory after the fact to crime is precluded if principal is acquitted of crime after jury trial).

2. Knowledge of the Crime.

There are few Florida cases discussing what level of knowledge the defendant must have of the underlying crime. Mere suspicion that a crime has been committed is not enough. State v. Gardner, 112 N.M. 280, 814 P.2d 458 (Ct.App.1991). On the other hand, it is not essential that the State prove that Ms. Bowen was an eyewitness to each of Carr's crimes. See State v. Taylor, 283 So.2d 882 (Fla. 4th DCA 1973) (reversing dismissal of information for accessory after the fact when traverse alleged that the principal told defendant she had committed crimes).
We conclude that the State must prove that Ms. Bowen either directly knew or was provided sufficiently reliable information of facts that would give a reasonable person sufficient basis to believe that Carr had committed the crime alleged. See State v. Rider, 229 Kan. 394, 625 P.2d 425 (1981); Commonwealth v. Devlin, 366 Mass. 132, 314 N.E.2d 897 (1974); Maddox v. Commonwealth, 349 S.W.2d 686 (Ky. 1960); Roberson v. State, 69 Ga.App. 541, 26 S.E.2d 142 (1943). See also Taylor, 283 So.2d 882 (commenting that the court found little distinction between knowing the principal was wanted by authorities for a crime versus knowing the person actually committed the crime); State v. Severin, 250 Neb. 841, 553 N.W.2d 452 (1996) (holding that defendant had sufficient knowledge of crime when police officer explained that principal was wanted for specific felony and principal admitted to defendant that she knew she was wanted by police).
Because section 777.03(2) links the degree of Ms. Bowen's crime to the severity of the crime committed by Carr, the State must prove that Ms. Bowen knew of the specific crime alleged. This was not always the case. Prior to 1995, accessory after the fact was a third-degree felony, regardless of the severity of the underlying crime. § 777.03, Fla. Stat. (1993); Staten, 519 So.2d at 626. Similarly, other jurisdictions do not recognize the crime of accessory after the fact, but simply treat similar behavior as the separate crime of obstruction of justice. See People v. Clark, 221 Ill.App.3d 303, 163 Ill.Dec. 568, 581 N.E.2d 722 (1991). Under those circumstances, it may not be necessary to prove knowledge that a specific crime had occurred. See, e.g., C.J.P. v. State, 672 So.2d 62 (Fla. 1st DCA 1996) (discussing whether defendant knew felony had been committed).
In 1995, however, the legislature amended the statute to link the degree of the crime for accessory after the fact to the degree of the crime committed by the principal. Ch. 95-184, § 13, Laws of Fla. Thus, an information charging accessory after the fact must specify the crime alleged to have been committed by the principal. To prove the level of offense charged, therefore, the State must present evidence concerning that specific crime and the defendant's knowledge of it.[5] *52 Further, the defendant's knowledge must encompass the significant elements of the crime. United States v. Graves, 143 F.3d 1185 (9th Cir.1998) (holding defendant could not be charged as accessory after the fact to felon in possession of firearm unless he knew the principal was a felon).
Proving a defendant's knowledge of the underlying crime will often require relying solely on circumstantial evidence. In that event, the circumstantial evidence must be consistent with the defendant's guilt and inconsistent with any reasonable hypothesis of innocence. Gawronski v. State, 444 So.2d 490 (Fla. 2d DCA 1984); Holley v. State, 406 So.2d 65 (Fla. 1st DCA 1981).

3. Maintenance, Assistance, or Aid.

The State must prove that Ms. Bowen provided some maintenance, assistance, or aid to Carr after he committed each crime. Although the common law recognized the crime of misprision of a felony for failing to report a felony to authorities, the substantive law of Florida does not recognize such a crime. Holland v. State, 302 So.2d 806 (Fla. 2d DCA 1974). Thus, the crime of accessory after the fact requires some overt action by the defendant. Roberts v. State, 318 So.2d 166 (Fla. 2d DCA 1975) (holding that merely living with person, knowing that there is an active outstanding warrant for person's arrest, does not constitute crime of accessory after the fact). See also State v. Brown, 197 Neb. 131, 247 N.W.2d 616 (1976); Lowe v. People, 135 Colo. 209, 309 P.2d 601 (1957).
On the other hand, the State need not prove that Ms. Bowen's assistance was successful in allowing Carr to escape. Cf. Bush v. State, 359 So.2d 556 (Fla. 4th DCA 1978) (holding that there is no crime of attempted accessory after the fact, because the crime itself is accomplished by an attempt or intent to aid). It is sufficient for the State to prove that Ms. Bowen committed some overt act intending to assist Carr in avoiding or escaping detection, arrest, trial, or punishment, even though he was eventually apprehended.
The type of overt act that will make one criminally responsible for this offense, however, is subject to some debate. In some jurisdictions, merely disavowing knowledge of a crime or of the perpetrator or his whereabouts is not enough to support a conviction for accessory after the fact. See United States v. Magness, 456 F.2d 976 (9th Cir.1972); United States v. Foy, 416 F.2d 940 (7th Cir.1969); Miller v. United States, 230 F.2d 486 (5th Cir.1956). These cases are a logical extension of the principle that a person generally has no duty to report a crime or to respond to police inquiries.
Other jurisdictions disagree whether a falsehood told to a police officer during his investigation of a crime will support a conviction as accessory after the fact. Compare Farmer v. State, 56 Okla.Crim. 380, 40 P.2d 693 (1935), and Wren v. Commonwealth, 67 Va. 952, 26 Gratt. 952 (Va. 1875) (requiring that aid be personally given to perpetrator), with People v. Duty, 269 Cal.App.2d 97, 74 Cal.Rptr. 606 (1969) (holding that defendant's action in lying to officer to provide perpetrator with false alibi is act sufficient to support conviction as accessory after the fact), and Easter v. State, 536 S.W.2d 223 (Tex.Crim.App.1976) (noting that lying to officer about details of crime may constitute aid sufficient for conviction for accessory after the fact). See *53 also McFarland v. Childers, 212 F.3d 1178 (10th Cir.2000) (holding officer was entitled to qualified immunity in civil rights action for false arrest because law is not clearly established on whether a falsehood to police is probable cause of accessory after the fact); United States v. Davis, 99 M.J. 942, 945 (Navy-Marine Ct.Crim.App. 1994) (noting federal circuits appear to be split on whether merely lying about knowledge of whereabouts of perpetrator is sufficient to constitute accessory after the fact).
In Florida, we have found only one case presenting this issue, but not addressing it specifically. In State v. Taylor, 283 So.2d 882 (Fla. 4th DCA 1973), the Fourth District reversed a trial court order dismissing an information for accessory after the fact. The issue on appeal was whether the information sufficiently alleged the defendant's knowledge of the underlying crimes. However, the opinion reflects that through a bill of particulars, the acts of aid alleged were "denying knowledge of the whereabouts" of the perpetrator and "concealing her identity by falsely identifying her as another person." Id. at 883. We agree that certain falsehoods told to an officer seeking information, which go beyond merely disavowing knowledge or refusing to cooperate with an investigation, may support a conviction for accessory after the fact. See Taylor, 283 So.2d 882; Duty, 269 Cal. App.2d 97, 74 Cal.Rptr. 606.
Finally, even if Ms. Bowen eventually cooperated in full with the police, an earlier act to assist Carr could constitute the crime of accessory after the fact. See Schramm v. State, 374 So.2d 1043 (Fla. 3d DCA 1979). From a practical standpoint, however, persons who eventually cooperate are not commonly prosecuted for accessory after the fact, because this would remove any incentive to admit their misfeasance and cooperate to assist the police.

4. Intent.

The State must prove that any aid Ms. Bowen gave to Carr was given with the specific intent to aid him in avoiding punishment. For example, aid given to a felon to protect one's personal safety or for other personal reasons, but without the intent to assist the felon, will not support a conviction for accessory after the fact. See, e.g., Helms v. State, 349 So.2d 726 (Fla. 4th DCA 1977) (holding evidence that defendant purchased marijuana that he knew was stolen, and thus helped thieves dispose of it, was not sufficient to prove accessory after the fact to theft); Whorley v. State, 45 Fla. 123, 33 So. 849 (Fla.1903) (holding defendant, who was surety on bail bond, could not be convicted as accessory after the fact when he exercised his right to refuse to allow bonded individual to leave state to assist police in catching perpetrator of crimes). See also Maddox v. Commonwealth, 349 S.W.2d 686 (Ky.1960).
As with the element of knowledge, proof of the defendant's intent is often supported only by circumstantial evidence, which must be sufficient to exclude a reasonable hypothesis of innocence. See Gawronski, 444 So.2d 490. In addition, the type of aid given often provides the best circumstantial evidence of intent. That is, the greater the aid and the greater the potential it had to assist the felon, the more likely it was done with the requisite intent. See, e.g., Hearn v. State, 43 Fla. 151, 29 So. 433 (Fla.1901). See also Stephens v. State, 734 P.2d 555 (Wyo.1987) (holding evidence of intent to aid insufficient when defendant merely disavowed knowledge after the principal was apprehended).
*54 There are two legal aspects of this case that warrant special comment. First, if Ms. Bowen had exercised her right to remain silent and not cooperate with the police, the State could take no action against her. Thus, it is her equivocal attempts to assist police on the day of the crime that have exposed her to these charges. Second, although the evidence strongly suggests that Ms. Bowen was guilty of committing the crime of accessory after the fact concerning the Ohio drug charge, and this charge probably could have been brought against her in Florida because she committed her acts in Florida, cf. Roberts, 318 So.2d 166, the State never charged her with this minor felony offense. Instead, the State charged the more tenuous crimes of accessory after the fact to the four homicides and escape. These charges are major felonies carrying long prison sentences.

III. THE EVIDENCE
Whether Ms. Bowen is guilty of the crime of accessory after the fact to each of Carr's crimes depends greatly on the timing of the events on May 19, 1998. As a result, although the summary of the facts presented in section I of this opinion provides a quick reference for this case, a more thorough examination of the evidence is necessary to resolve whether the State presented competent, substantial evidence of Ms. Bowen's guilt. Because Ms. Bowen is challenging the trial court's judgment, the evidence is presented in the light most favorable to the State.
Ms. Bowen began her ill-fated relationship with Hank Earl Carr, a/k/a James Earl Reed, a/k/a Joseph Bennett, a/k/a Eric Weaver, a/k/a "Boo" in 1993.[6] Carr was an acquaintance of Ms. Bowen's former husband, Joseph Lee Bennett. In December 1994, when Ms. Bowen was a recent divorcee with two small children, Carr and Bowen first lived together in Ohio.
In February 1995, the local Ohio newspaper ran a column of neighborhood indictments, which included information that Hank Carr had been indicted for trafficking in marijuana based on three alleged sales of the drug. Shortly after this article was published, Carr's ex-girlfriend told him about it. At the end of the month, Carr and Ms. Bowen left for Georgia, leaving Ms. Bowen's children with her mother.
On July 4, 1995, a deputy sheriff in Georgia stopped the couple's automobile. Carr provided the deputy with identification as Hank Earl Carr, and the deputy determined that Carr was wanted in Ohio. Carr successfully fled on foot from this stop, leaving Ms. Bowen and the car on the side of the road.
The couple re-established contact within a month. Ms. Bowen sold her Ohio home in July 1995, and in August the couple went to Flagstaff, Arizona, and purchased *55 a motorcycle. They then traveled to South Dakota, and Ms. Bowen got a job at a convenience store. In South Dakota, some acquaintances knew Carr as Eric Weaver, but Carr also pawned some property using the name Hank Earl Carr. On November 14, 1995, Carr was arrested and booked into jail in the name Hank Carr for an altercation at the convenience store where Ms. Bowen worked. While he was still in jail, the South Dakota authorities discovered the Ohio warrant, but Carr managed to bond out and disappear.
In January 1996, Carr and Ms. Bowen traveled through West Virginia and Pennsylvania. By 1997, the couple had relocated to Tampa, where Carr's mother, Sonja Gail Cox, lived. The couple eventually moved into an upstairs apartment on Crenshaw Street. Under the name James Earl Reed, Carr became the manager for this modest apartment building. In September 1997, Carr apparently received some medical treatment under the name Eric Weaver. In November 1997, Ms. Bowen's children came to Florida to live with them. The couple obtained a bank account in the names of Joseph and Bernice Bennett. Acquaintances of the couple knew Carr as "Boo" or "Earl." The couple had an isolated contact with Tampa police due to a neighborhood dispute in April 1998, during which Carr presented a picture ID identifying him as Joseph Bennett. In February and March 1998, investigators from the Department of Children and Family Services visited the couple. The first investigator knew Carr as "Boo Bennett" and "Earl Reed." Carr introduced himself to the second investigator as James Earl Reed, but the investigator spoke to his mother who identified him as Hank Carr. Neither investigator found any sign of abuse or neglect during their investigation.
Many acquaintances of the couple knew that Carr regularly carried a pistol and had a variety of guns. Numerous weapons were found in the apartment during the investigation of this case, all of which were legally owned. Many of these same acquaintances, including Ms. Bowen, knew that Carr owned a handcuff key, which he kept in a pocket or tied around his neck.[7] The evidence supports the inference that he had no intention of voluntarily returning to jail or prison and that Ms. Bowen was willing to assist him in avoiding incarceration. Until May 19, 1998, this couple lived in their own small-time, "Bonnie-and-Clyde" delusion without much notice from the rest of the world.
Everything changed on May 19. On that day, Carr and Ms. Bowen were living in the apartment with four-year-old Joey and his five-year-old sister, K.B. At about 9:30 a.m., Ms. Bowen was speaking with a neighbor and then headed up the enclosed stairs to the apartment. Sometime shortly thereafter, an assault rifle discharged inside the apartment, and Joey was struck in the face. Carr, K.B., and Joey were inside the apartment at the time the gun went off. There is conflicting evidence of Ms. Bowen's precise location when the rifle discharged. She was either near the front door of the apartment or in a separate room inside the apartment.
Ms. Bowen came downstairs screaming for help for her baby, quickly followed by K.B. and Carr. Carr then went back upstairs to the apartment and returned carrying the little boy. According to the neighbors who witnessed the scene, Ms. Bowen and Carr were frantic and panicking. *56 Carr placed the child in a car, and the couple left K.B. with a neighbor as they drove to get help. A neighborhood policeman directed the couple to a nearby fire station. They took the child to the station, where paramedics began providing treatment.
Several police officers arrived. In conversations with the police, the couple identified themselves as Joseph and Bernice Bennett, and Carr produced the Virginia photo identification card in that name. Carr appeared distraught and kept saying that the shooting was an accident. He related to one officer that the child was dragging a rifle and when he told the child to put the rifle down, it discharged. At least in hindsight, one officer believed that his emotions were "put on." No one suggests that Ms. Bowen's state of shock following the bloody shooting of her son was not genuine. More than one officer described her as hysterical, crying, and sobbing.
The paramedics declared Joey dead around 9:55 a.m. At this point, Carr jumped back into the car, saying that he was going to check on K.B., and drove off, despite officers yelling at him to stop.
Following her son's death, Ms. Bowen remained at the fire station answering questions from various officers. As a result, she did not witness the critical events involving Hank Earl Carr for the next several hours. It appears that she never saw Carr alive after he left the fire station. To avoid confusion, this opinion first explains the facts concerning Carr and then examines the same time frame from Ms. Bowen's perspective.

1. The Events After 10 a.m. on May 19 Concerning Hank Carr.

Carr arrived back at the Crenshaw apartment before any police arrived. When the first officer arrived, he found Carr at the top of the stairs near the entrance to the second-floor apartment, holding an assault rifle. With their hands on their weapons, the police ordered Carr to drop the weapon and, after a second or third request, he did.
The officers positioned Carr at the base of the stairs and left the assault rifle at the top of the staircase. A neighbor heard Carr explaining to police that the shooting was an accident. At about 10:30 a.m., even though he was in the presence of several officers, Carr broke free and fled. Around the same time, Detectives Bell and Childers arrived at the scene. The neighbor, who had previously heard Carr say he had run from police up north, warned an officer, "You better be careful." In a few minutes, the police captured Carr and returned him to the apartment. Presumably, at this point, Carr was under arrest for resisting an officer, but not for manslaughter.[8] Carr was handcuffed and transported to police headquarters in downtown Tampa for questioning. Carr probably arrived at the police station shortly before 11 a.m.
Detectives Childers and Bell proceeded to interview Carr at the police station. Unlike similar interviews of Ms. Bowen, these interviews were apparently unrecorded. Because all three participants in this interview died within a few hours, we have no information about it. At about 12:30 p.m., an officer who had interviewed one of the couple's neighbors briefly spoke *57 with Detective Childers to tell him what he had learned in the interview.
After approximately two hours at the police station, Detectives Childers and Bell took Carr back to the Crenshaw apartment. They spent about half an hour with Carr there. Detectives Stanton and Clark were also at the apartment investigating the crime scene. Detective Stanton heard Carr explaining to Detectives Bell and Childers that the gun had accidentally discharged. He briefly pulled Detective Childers aside to tell him of the numerous guns, ammunition, and protective gear found in the apartment. According to the accounts of Detectives Stanton and Clark, Detectives Bell and Childers and Carr got back in the police car to return to the station somewhere around 2 p.m. When they left, the detectives put a second assault rifle found at the apartment in the trunk of their cruiser.
Detectives Bell and Childers never arrived at the police station. It is clear that Carr killed the two officers. Precisely how he killed them is a matter of some speculation because there were no eyewitnesses. The only testimony about the murders came in self-serving statements Carr made to an officer and to a radio station disc jockey. It is believed that the officers had handcuffed Carr with his hands in front. He somehow used his handcuff key to break free and obtained one of the officer's handguns, which he used to shoot both officers. These murders occurred around 2 p.m. on Floribraska Avenue.
After killing the two officers, Carr retrieved the assault rifle from the trunk of the cruiser. He also took the detectives' weapons. He then hijacked a citizen's truck and went north on Interstate 275. A 911 call reporting the car-jacking led to an officer discovering the bodies of the two police officers. This was reported to the police station shortly after 2 p.m.
At approximately 2:30 p.m., Trooper James Crooks tried to stop Carr near the interstate exit for State Road 54. Carr pulled over, got out of the truck with a weapon, and shot at Trooper Crooks while he was still in his car, first through the windshield and then through the side window. These shots killed Trooper Crooks before he could unholster his gun. A citizen tried to pursue Carr as he got back in the truck and drove off, but thought better of it when Carr appeared to be positioning the rifle in his direction.
Carr proceeded north on the interstate, apparently with police officers chasing him and shooting at him. Carr pulled off the interstate at State Road 50 and holed up in a gas station around 3 p.m., where he took the attendant hostage. Certainly, by 3:30 p.m., Carr was surrounded by a large group of heavily armed police officers.
While at the gas station, Carr telephoned his mother. A Tampa police officer already at her home spoke with Carr. At this time, the officer knew of the detectives' deaths, but not of the death of Trooper Crooks. Carr told the officer that the shooting of Joey was accidental, but admitted killing the two detectives when they told him they were taking him to jail. Carr did not mention Trooper Crooks.
Shortly after this call, radio station personnel who had heard of the crime placed a call to the gas station and spoke to both Carr and the attendant. The radio station received Carr's permission to broadcast his statement, and the taped statement was admitted into evidence at the trial. In the statement, Carr said he came out of the bathroom that morning to find that Joey had knocked down a rifle that Carr was keeping for a friend. When Carr took the gun from the child and went to put it up, the gun stock hit the wall and the gun *58 discharged. Carr said he panicked and put the still-alive Joey in the car to seek medical attention. By the time he arrived at the fire station, however, Carr said he knew the child was dead. He returned to the apartment to check on K.B., where he was confronted by officers. According to Carr, the officers confronted him about the killing and accused him of lying. After he explained his version of events at the apartment, the detectives told him he was going to prison and placed him in the car. He asked them if he was really going to prison, and when they answered yes, he escaped and killed them. He forced a driver behind the police car out of a pickup truck, and he drove the truck north. When officers giving pursuit started shooting at him and blew out his tires, he headed into the gas station. Carr was shot while running into the gas station. Carr stated, "The death of my son was an accident. It was a terrible accident." Carr indicated that he would not hurt the hostage, but he would not let her go until he had a chance to talk to his wife, who was on the way. He said, "I want to tell her I'm sorry and that it was an accident. She was there. She knows it was an accident." At the end of the tape, he told the radio disc jockey, "My real name isn't Joseph Lee Bennett." He said his name was Hank Earl Carr.
After this interview, Carr spoke briefly to his ex-girlfriend from Ohio and then apparently spoke with Ms. Bowen, who accompanied officers to the gas station for this purpose. Around 7:30 p.m., Carr released the attendant and shot himself.

2. The Events After 10 a.m. on May 19 Concerning Bernice Bowen.

When Joey died and Carr left the fire station, Ms. Bowen remained and answered the questions of various officers. She explained that she left the apartment that morning to put a broken VCR in her car, and as she returned up the stairs, she heard the gunshot, opened the door, and saw her injured son. According to Ms. Bowen, a friend had asked them to keep the rifle for him the prior evening and told them it was not loaded. She asserted that Carr would not have intentionally shot the child. Ms. Bowen became hysterical every time the child's death was mentioned. At some point in relating these events, Ms. Bowen became nauseous and was taken to a restroom were she vomited. At 10:57 a.m., Ms. Bowen was still in the restroom answering intermittent questions from officers when she agreed to provide the police consent to search her apartment. She signed the consent form "Bernice A. Bennett." The detective seeking consent told Ms. Bowen that Carr had been captured and taken to the police station.
Ms. Bowen agreed to return to the apartment and reenact the events. However, when she arrived at the apartment and saw the blood on the floor, she said she could not go through with it. When one of the detectives noticed blood on her jumpsuit, Ms. Bowen agreed to surrender the suit for testing. She agreed to go to the police station for further questioning, where she changed clothes. Ms. Bowen was not under arrest at this time. No one had suggested to her that the police suspected that Carr had some criminal involvement in Joey's death.
Ms. Bowen probably arrived at the police station around noon. She was placed in a room close enough to where Carr was being interviewed that she could sometimes hear his voice. After some initial conversation with officers, Ms. Bowen gave her first taped interview at 12:35 p.m. It lasted about eleven minutes. In the beginning of that interview, she explained, "My boyfriend I'm referring to as [sic] known as Joseph Bennett." She again related *59 that a friend had brought the rifle over the preceding night and asked them to hold it for him. When she went to bed, she assumed the rifle was placed out of reach of the children. In the morning, she went downstairs to place a VCR that needed repair in her car. As she returned up the steps and opened the door, she saw only her injured son and then ran down the steps screaming. Ms. Bowen stated that her boyfriend did not explain to her what happened, and she did not ask because she was preoccupied with getting help for the child. Although the officers explored some details about her boyfriend and their relationship, they never asked about his possession of a handcuff key, and she never volunteered any information about a key. At the end of the interview, Ms. Bowen was asked to state her name and responded, "Bernice Bennett."
For the next hour, it appears that Ms. Bowen was available at the police station but she was not the focus of any investigation. In the interim, officers interviewed two neighbors and K.B., but the contents of these interviews are not reflected in the record and apparently were not reported to Ms. Bowen. At some point, Ms. Bowen was asked to undergo a paraffin test and she agreed. The test came back negative.
Shortly after 2 p.m., the two officers were killed and their deaths were reported to the police station. At that point, as one officer noted, mass confusion ensued. Detective Jerry Keith took Ms. Bowen into a separate room and asked her to help him find a photograph of Carr using a computerized database of arrest photographs. He explained these photos were archived under the name the person gave at the time of the arrest. Immediately preceding this process, Detective Julie Massucci entered the room. She told Ms. Bowen that Carr had killed two police detectives who were friends of Detective Massucci. Detective Massucci testified that she knelt down, took Ms. Bowen's hand, and told her that her son and now two officers had been killed by this man, and the police needed her help to identify him before he hurt someone else. This information was provided to Ms. Bowen no later than about 2:15 p.m. Detective Massucci then left Ms. Bowen with Detective Keith to review photographs.
According to Detective Keith, Ms. Bowen agreed to help and provided him many different first and last names. She said her boyfriend was age thirty and born in January, which appears to be accurate from the record. However, she denied knowing Carr's "real" name, and did not provide the name, "Hank Earl Carr." She gave him the name "Carr," and toward the end of the interview gave him the name "Hank," but did not give him the complete name, "Hank Carr." Detective Keith used these names to pull up photographs, but Ms. Bowen said the photos were not of her boyfriend. When he was provided the name "Hank," Detective Keith ran that name with all of the last names, but nothing Ms. Bowen recognized came up. The record does not reflect whether Carr was ever arrested in Hillsborough County, and therefore, whether any picture of him existed in this database under any of his assumed names.
About twenty-five minutes into this interview, Detective Keith asked about Carr's mother. Ms. Bowen provided Gail Cox's name and a correct address, and Detective Keith terminated the interview to report this new information. An officer was dispatched to the mother's house and arrived there by approximately 2:40 p.m. Ms. Cox provided Carr's name. Based upon this information, at approximately 4 p.m., police located an expired Florida driver's license, issued in 1991, in the name of Hank Carr.
*60 Between 2:45 p.m. and 3:30 p.m., Ms. Bowen was not the subject of significant scrutiny at the police station. At some point, Detective Donna Keene spoke with Ms. Bowen. Detective Keene testified that she mentioned three officers had been killed, and that she confronted Ms. Bowen with the fact that Carr's name could not be Joseph Bennett. It is not clear how Detective Keene knew about Trooper Crooks' death, and she apparently did not differentiate his death from the other two detectives in her conversation with Ms. Bowen. As Detective Keene spoke with Ms. Bowen, Corporal Herren was setting up equipment to perform a second taped interview of Ms. Bowen.
At 3:30 p.m., Corporal Herren interviewed Ms. Bowen, and began to tape the interview at 3:45 p.m. At the beginning of the interview, Corporal Herren told Ms. Bowen that he needed to find out as much information as he could because two police officers had been shot. Ms. Bowen identified herself as Bernice Bowen and stated that her boyfriend says his name is Joseph Bennett, but that he went by the names of Hank Carr, Earl Reed, and Boo. During this interview, which lasted twenty-five minutes, Ms. Bowen twice related the same facts regarding the morning's eventsthat she placed a VCR in her car and was returning up the stairs when she heard a shot, opened the door, and saw her injured son. She explained that the gun was brought to the home the preceding evening by a friend and that she believed the gun was unloaded and out of reach of the children when she went to bed. According to Ms. Bowen, she did not ask for or receive details about Joey's shooting from Carr. When asked about Carr's mother, Ms. Bowen stated Ms. Cox's name and correct address, but provided an erroneous telephone number. Ms. Bowen provided various other information regarding Carr and her relationship with him, some of which is supported by other evidence in the record, but some of which is contradicted by other evidence. Before the interview was finished, an incoming telephone call requested that Ms. Bowen come to the gas station because Carr refused to release the hostage until he spoke with her. The interview ended at 4:10 p.m.
Ms. Bowen agreed to go to Hernando County to speak with Carr. She was flown to the scene by helicopter, where she spoke with Carr presumably by phone or police equipment. After this conversation, the details of which are not in the record, Carr released the store attendant and killed himself. Although, as set out above, Carr gave various statements throughout the day regarding his version of Joey's shooting, there is no evidence Ms. Bowen heard any of these statements, either directly or from any officers.
After Carr's death, Ms. Bowen returned to the police station. She was not under arrest. At 9:40 p.m., she provided a third taped interview. During this interview, Ms. Bowen was asked for various details about Hank Carr and her relationship with him. Again, some of her responses were consistent with other evidence presented at her trial, others were not. She admitted providing the police the name Joseph Bennett that morning, but said she only did so on Carr's request, not because she wanted to help him. She also admitted she knew Carr possessed a handcuff key. After this interview, Ms. Bowen was allowed to leave the police station, but was arrested a few days later.

IV. THE STATE FAILED TO PROVE A PRIMA FACIE CASE OF ACCESSORY AFTER THE FACT TO MANSLAUGHTER
The State did not present competent, substantial evidence that would have allowed a jury to conclude beyond a reasonable *61 doubt that Ms. Bowen was an accessory after the fact to the manslaughter of her son. First, the circumstantial evidence presented did not rebut the reasonable hypothesis of innocence put forth by Carr himself that the shooting was an accident, not the result of any culpable negligence or intent. Second, even if the State presented a prima facie case that a manslaughter occurred, it could provide only circumstantial evidence of Ms. Bowen's knowledge of the crime. This circumstantial evidence did not rebut Ms. Bowen's reasonable hypothesis that she merely believed the child's death was an accident and had no knowledge of facts to prove otherwise. Thus, Ms. Bowen was entitled to a judgment of acquittal on this charge.
The information in this case charged Ms. Bowen with accessory after the fact to "manslaughter with a firearm," without specifying whether the manslaughter was alleged to have been committed through act, procurement, or culpable negligence. See § 782.07(1), Fla. Stat. (1997). The jury instructions given by the trial judge, however, defined manslaughter as "the intentional causing of the death of another human being or the causing of another human being's death by culpable negligence." The trial judge then defined "culpable negligence" as it is defined in the standard jury instruction for manslaughter. See Fla. Std. Jury Instr. (Crim.) 101. The jury instructions did not include any reference to or explanation of "excusable homicide." See § 782.03, Fla. Stat. (1997); Fla. Std. Jury Instr. (Crim.) 93 (defining excusable homicide as homicide which is "committed by accident and misfortune in doing any lawful act by lawful means with usual ordinary caution and without any unlawful intent.").
Thus, in order to prove Ms. Bowen was an accessory after the fact to manslaughter, the State needed to prove that Carr killed the little boy by an intentional act or an act of culpable negligence, and that Ms. Bowen had sufficiently reliable information of facts that would provide her sufficient basis to believe that Carr had acted with intent or culpable negligence. The State's presentation of proof was severely hampered by the lack of any eyewitness to the shooting and by the conditions inside the apartment that made all forensic evidence inconclusive.
The only potential eyewitnesses to Joey's death were Carr, Ms. Bowen, and K.B. Ms. Bowen consistently maintained that she was outside the apartment and did not see the shooting. The State did not present the testimony or any statements of K.B. Carr made various self-serving statements to the police and the media in the hours before he committed suicide, but in each he always maintained that the shooting was simply an accident. At one time, he maintained that the child was dragging the gun when it went off. At another, he said the gun discharged as he tried to pull it away from the child. In two statements, Carr said that Ms. Bowen was in the bathroom when the shooting occurred, and the shooting occurred in the main room of the apartment. None of these statements establish that a manslaughter by culpable negligence occurred.
Thus, the State was forced to rely heavily on circumstantial evidence to show a manslaughter occurred. This circumstantial evidence does not rebut the reasonable hypothesis of innocence asserted by Carr that the shooting was an accident not involving culpable negligence.
Under Florida law, culpable negligence involves a state of mind so wanton or reckless that the behavior it produces may be regarded as intentional. See Charlton v. Wainwright, 588 F.2d 162 (5th Cir.1979). It involves negligence of such a gross and flagrant character that it evinces *62 a reckless disregard for human life. Id. It is undisputed that Carr allowed the child to be around guns and to play with guns. However, there was no evidence where this rifle was located when the child apparently obtained it. There was no evidence that either Carr or Ms. Bowen knew the gun was loaded, because the unrefuted evidence was that the gun was brought to their home the prior evening. There is no circumstantial evidence that places Carr or Ms. Bowen close to the child at the time of the shooting. Forensic experts never located the lethal bullet or determined its trajectory; in large part because there were so many bullet holes in the apartment that the police could not locate the relevant hole. Thus the forensic experts could not conclude from what angle the gun was shot or in what position the child was standing. Although the rifle was almost certainly too big for the child to have pulled the trigger with his finger and shot himself, nothing in the record rules out the possibility of an accidental discharge caused by a child bumping the trigger against another object. Even if one assumes that Carr was holding the gun at the time it discharged, nothing rules out the possibility of an accident short of manslaughter. In such a situation, the evidence does not conclusively refute the reasonable hypotheses that the shooting was not a result of culpable negligence. See Hodge v. State, 315 So.2d 507 (Fla. 1st DCA 1975); Weinstein v. State, 269 So.2d 70 (Fla. 1st DCA 1972).
Even if there were competent, substantial evidence sufficient to find that a manslaughter had occurred, there was no competent, substantial evidence that Ms. Bowen knew this. Ms. Bowen consistently stated that she did not see the shooting because she was outside the apartment. Although Carr stated she was inside the apartment, he said she was in another room when the shooting occurred. The State presented rather inconclusive blood splatter evidence consistent with Ms. Bowen being inside the apartment or at the threshold to it when the gun discharged, but this evidence does not establish that she was in a position to witness acts constituting culpable negligence as compared to the horrible result of the shooting.[9]See Gawronski v. State, 444 So.2d 490 (Fla. 2d DCA 1984) (holding evidence that defendant's car was present at scene of crime and that defendant was found in car with principal after high-speed chase insufficient to exclude reasonable hypothesis of innocence in prosecution for accessory after the fact); Holley v. State, 406 So.2d 65 (Fla. 1st DCA 1981) (similar).
While Carr and Ms. Bowen were together on May 19, Carr consistently stated the shooting was an accident. He did not tell *63 her specifically how it had occurred. There was no evidence that Ms. Bowen heard any of the other statements made by Carr as the day progressed as to how the shooting occurred. The police never arrested Carr for this homicide. The case was still under investigation when Carr killed the two detectives. There is no evidence the police even suggested to Ms. Bowen that Carr was criminally responsible for the death of her son until after he had killed the two police officers. Under these circumstances, there was no evidence that Ms. Bowen was provided with sufficiently reliable information that gave her sufficient basis to believe the shooting of her child was an act of culpable negligence or intent. Thus, Ms. Bowen was entitled to a judgment of acquittal as to this count during the trial of this case.

V. THE STATE FAILED TO PROVE A PRIMA FACIE CASE OF ACCESSORY AFTER THE FACT TO THE MURDER OF TROOPER CROOKS
Similarly, the State did not present competent, substantial evidence sufficient to allow a jury to conclude, beyond a reasonable doubt, that Ms. Bowen knew Carr had killed Trooper Crooks when she rendered aid to Carr.
Carr killed Trooper Crooks around 2:30 p.m. By all accounts, conditions at the police station were quite hectic. Although numerous police officers had contact with Ms. Bowen between 2:30 p.m. and 3:30 p.m., only one officer testified that she, the officer, knew that Trooper Crooks had been killed during this time period. Once Ms. Bowen finished her interview with Detective Keith, Detective Donna Keene apparently spoke with her. Detective Keene testified that she told Ms. Bowen that Carr had killed "three police officers and including [sic] her son." There is no evidence Detective Keene specified the names of the officers or in any way differentiated the killing of Trooper Crooks from the killing of the two detectives. Immediately after this conversation, Detective Herren specifically told Ms. Bowen during her second taped interview that only two officers had been killed. This recording, occurring from 3:45 to 4:10 p.m., includes no reference to the death of Trooper Crooks. It is during this interview that Ms. Bowen provided the three names Carr was known by. In addition, at the home of Gail Cox, another Tampa police officer spoke by telephone with Carr while Carr was at the gas station, after he had killed Trooper Crooks, but the officer was unaware of that event and Carr said nothing about it.
Consequently, it is not entirely clear from this record that Detective Keene was talking about the trooper when she made her statement to Ms. Bowen. Even if she was, she described "three police officers and including [sic] her son." She never said that Carr had now killed another law enforcement officer or that he had killed a trooper in addition to her son and the two detectives. We are forced to conclude that the State did not present prima facie evidence that Ms. Bowen had actual knowledge of the crime committed against Trooper Crooks. The equivocal information Detective Keene provided to Ms. Bowen was not enough to give a reasonable person a sufficient basis to believe that Carr had committed a third murder, separate and apart from the first two.
Even if this information were sufficient to provide Ms. Bowen actual knowledge of the murder, the information was provided after the interview between Detective Keith and Ms. Bowen during which she did not give the full name "Hank Carr." Immediately after Detective Keene spoke with Ms. Bowen, Ms. Bowen gave a second taped statement during which she disclosed the name "Hank Carr" and the two *64 other names by which he was most commonly known. Once Ms. Bowen revealed Carr's full name and he was surrounded by law enforcement at the gas station, the record contains no allegation or reasonable claim that Ms. Bowen thereafter took an action intended to aid Carr's escape. Accordingly, Ms. Bowen was entitled to a judgment of acquittal from the trial court on this charge.

VI. A NEW TRIAL IS REQUIRED ON THE REMAINING COUNTS
Although the window of time permitting the State to charge Ms. Bowen with the offenses of accessory after the fact to the escape of Carr[10] and the murders of Detectives Bell and Childers is limited, we conclude that the State presented prima facie evidence from which a jury could conclude that Ms. Bowen was an accessory after the fact to these crimes. Nevertheless, Ms. Bowen's convictions for these crimes were tainted by the evidence presented and the arguments made to support the two charges for which she should have received a judgment of acquittal. Specifically, the State relied upon the charge of accessory after the fact to manslaughter to produce evidence that Ms. Bowen knew Carr possessed a handcuff key and possessed guns, and to argue as a feature of its case that Ms. Bowen could have prevented the tragic death of three law enforcement officers. As a result of the prejudice caused by this tactic, Ms. Bowen is entitled to a new trial on the three remaining charges.
The detectives' murders occurred around 2 p.m. Prior to that, Ms. Bowen was informed that Carr was in police custody, and she knew he was at the police station because she could hear his voice. At approximately 2:15 p.m., Ms. Bowen received sufficient credible information from Detective Massucci to establish her knowledge that Carr had committed two murders and had escaped from police custody. Nothing that Ms. Bowen did prior to that time could constitute the offense of accessory after the fact for these crimes.
The evidence is sufficient to allow the jury to conclude that Ms. Bowen knew Hank Earl Carr's full legal name when she was told of these offenses at approximately 2:15 p.m. From 2:15 p.m. until Ms. Bowen's second taped statement at 3:45 p.m., there was evidence to support a finding that Ms. Bowen, when questioned, provided many names for Hank Carr but did not provide the name "Hank Carr" as Carr's legal name. The jury could also conclude that Ms. Bowen knew Carr's proper name, due to documentary evidence found in her apartment. The jury was free to conclude that she provided other names but withheld this specific name for about ninety minutes. Although it is doubtful that this action played, or was likely to play, any significant role in obstructing the efforts of law enforcement to pursue Carr north on the interstate and apprehend him, a jury was free to conclude that Ms. Bowen intended her nondisclosure of his name to aid his escape.
Even though we conclude this evidence was sufficient to support the verdicts on these charges, it was not sufficient to overcome the harmfulness of the errors in this trial. In addition, it was tainted by the State's decision to introduce evidence of the handcuff key that, if relevant, was relevant primarily to support the charge for accessory after the fact to manslaughter. The State focused much of its entire *65 case against Ms. Bowen on that handcuff key.
Ms. Bowen had no legal duty to volunteer to the police any knowledge she possessed about Carr's handcuff key. The State acknowledged this at oral argument. If the police had asked her about a handcuff key when she knew that Carr had already committed a crime and she had provided false information, perhaps that would constitute the crime of accessory after the fact, but those are not the facts of this case. Thus, her failure to volunteer this information is not relevant as direct evidence of an act constituting aid or assistance.
Instead, Ms. Bowen's knowledge of the handcuff key was tangentially related to her intent. That is, an inference might be drawn that Ms. Bowen's knowledge of the key increased the likelihood that she intended to assist Carr even when she provided only minimal assistance by giving an improper name for him, because she knew that the key increased the likelihood that her assistance would be fruitful. This inference must be balanced against the fact that the record does not reflect whether Ms. Bowen knew Carr had the handcuff key on his person that morning. Even if she did, she was told that Carr had been taken into custody, and her taped statements reflected her belief that if Carr was carrying the key, the police would have found the key around Carr's neck when they arrested him. Thus, the inference supported by the key is modest at best.
Once Ms. Bowen knew that Carr had escaped from the two police officers, the relevance of the handcuff key becomes even more tenuous. Nevertheless, at trial the State continually asked officers who interviewed Ms. Bowen only after Carr had escaped whether she volunteered information about the handcuff key. At the end of her closing argument, in an accurate summary of the tenor of this trial, the prosecutor argued:
Ladies and Gentlemen, on the day that these detectives died, Hank Earl Carr had in his possession a handcuff key which allowed him to escape, which allowed him to murder three innocent people.
Bernice Bowen had a key that day. She had a key that would have prevented every one of those tragedies. All she had to do was tell the truth. All she had to do was say, his real name is Hank Earl Carr. He's a fugitive out of Ohio and other states. He's a wanted felon. He's a dangerous man. He's vowed never to go back to jail. He always carries a handcuff key and he said he would kill any cop who tried to take him in.
Hank Carr used his handcuff key. He used his key. She refused to use the key she had and three innocent lives were lost because of it. Thank you.
Through any number of actions, Ms. Bowen might have been able to prevent the crimes that occurred on May 19, 1998. For that, however, our law does not hold her criminally responsible. Our law holds her responsible for any assistance she gave Carr on that day, knowing he had committed those crimes, with an intent to assist him in avoiding punishment. In light of the lack of evidence supporting the convictions for accessory after the fact to manslaughter and to the murder of Trooper Crooks, and the very limited evidence supporting Ms. Bowen's convictions for accessory after the fact to Carr's escape and the murder of the two detectives, we cannot conclude that the evidence and arguments in the manslaughter charge did not improperly affect the jury's verdict on the charges that were properly submitted to *66 it.[11] Thus, Ms. Bowen is entitled to a new trial on the charges relating to the escape and the murder of the two detectives. Cf. Donaldson v. State, 722 So.2d 177 (Fla. 1998) (finding harmful error and reversing sentence when State suggested in penalty phase of trial that defendant was actually principal to crime in which he was convicted as only accessory after fact). In this trial, the evidence and arguments should concentrate on what Ms. Bowen did on May 19, 1998, after learning about these crimes to aid Carr, not on what she could have done to prevent other crimes.

VII. PREJUDICIAL EVIDENCE ON REMAND
Because this case is returning to the trial court for a new trial, we note that this trial was replete with evidence of prior bad acts on the part of Ms. Bowen and Carr. Much of this evidence was entered without objection, and thus any error was not properly preserved for review. In this appeal, Ms. Bowen specifically raises an evidentiary issue that was properly preserved for review: whether the trial court erred in admitting certain Williams[12] rule evidence. This evidence included an event in South Dakota where Carr, with the assistance or encouragement of Ms. Bowen, was alleged to have evaded police after an altercation. It also included an event in Georgia where Carr evaded police during a traffic stop while Ms. Bowen was present. We need not conclusively resolve these issues because we have disposed of this appeal based upon the sufficiency of the evidence. However, we comment on the admission of this evidence in the event it arises again on remand.
We do not believe that the Georgia incident falls within the definition of traditional Williams rule evidence. This incident does not indicate any wrongdoing on the part of Ms. Bowen, who was merely present when Carr ran from police. It was relevant to show that Ms. Bowen knew Hank Carr's name because he provided it to the officer, and that she knew he had outstanding charges because he was confronted with them and fled. As such, the trial court did not err by admitting this evidence.
With respect to the South Dakota incident, we do not foreclose that this incident may meet the test for evidence so similar to the charged crime that it is admissible as relevant evidence tending to show Ms. Bowen's knowledge of Hank Carr's character and past, and her intent to aid him in avoiding arrest or prosecution. See § 90.404(2)(a), Fla. Stat. (1997). Nevertheless, on remand the trial court may consider anew whether this evidence is unduly prejudicial. See § 90.403, Fla. Stat. (1997). We note that there is other, less prejudicial, documentary evidence that Ms. Bowen knew Hank Carr's real name.
Finally, we note that there were numerous other instances at Ms. Bowen's trial when the trial court admitted evidence tending to show the bad character of Carr or Ms. Bowen when the evidence had minimal probative value. This is an emotional and tragic case that requires special attention to ensure that any conviction obtained is achieved through appropriate and rational deliberation, not through moral indignation or unfair prejudice. We caution the trial court and the parties on remand *67 to examine closely whether such evidence is more probative than prejudicial.
Reversed and remanded.
PARKER, A.C.J., and GREEN, J., Concur.
NOTES
[1] These introductory facts and the more detailed statement of facts that follow are taken from the evidence at trial, viewed in the light most favorable to the State.
[2] The following discussion of the law regarding accessory after the fact is largely a result of the court's independent review of the case law in this area. The initial brief filed by Ms. Bowen's appellate counsel included only two case citations.
[3] Prior cases have divided this crime into three elements. See Carrillo v. State, 463 So.2d 450 (Fla. 2d DCA 1985); C.J.P. v. State, 672 So.2d 62 (Fla. 1st DCA 1996).
[4] Carr and Ms. Bowen often referred to themselves as a married couple, although they were not legally married. In his final radio interview, Carr referred to Joey as his son, and Ms. Bowen as his wife. If Carr and Ms. Bowen had been legally married, nothing that Ms. Bowen did would constitute the crime of accessory after the fact.
[5] In a related vein, at least one jurisdiction has held that a person can only face one conviction as an accessory after the fact for acts that assist a person guilty of numerous crimes. Compare People v. Perryman, 188 Cal.App.3d 1546, 234 Cal.Rptr. 181 (1987), with Heard v. United States, 686 A.2d 1026 (D.C.Cir.1996). If Ms. Bowen had been charged with misdemeanor obstruction of justice pursuant to section 843.02, Florida Statutes (1997) (see Francis v. State, 736 So.2d 97 (Fla. 4th DCA 1999)), rather than as an accessory after the fact, she would not have faced the same number of separate charges as she did in this case.
[6] There is no conclusive documentary evidence in this record of the legal names of either Bernice Bowen or Hank Carr, such as birth certificates or other legal documentation generally relied upon to prove identity. Although Bernice Bowen is Ms. Bowen's maiden name, there is no documentary evidence that this name was legally restored to her after her divorce. Much of the documentary evidence submitted at trial consisted of papers Ms. Bowen had signed under the names "Bernice Bennett" or "Bernice Bowen." Similarly, the State submitted a Florida driver's license for "Hank Earl Carr" issued in 1991 and a Virginia identification card in the name of Joseph Lee Bennett issued in 1996. Carr's last name does not match that of his mother or his uncle, the only two relatives mentioned in testimony. The most reliable evidence that Carr is, in fact, Hank Carr, was hearsay evidence from an officer who said that Carr's mother claimed that this was his real name, or the radio interview in which Carr stated his real name was Hank Earl Carr.
[7] At the time of these events, the concealed possession of such a key was not a crime. In direct response to Hank Earl Carr, it now is. See § 843.021, Fla. Stat. (2000); ch. 00-230, § 1, Laws of Fla.
[8] At the end of the day, officers found a criminal report affidavit in the slain detectives' car, filled out for Joseph Lee Bennett and listing misdemeanor charges of petit theft, trespass, and resisting an officer. There is no explanation in the record for the petit theft or trespass charges.
[9] There were two witnesses who were incarcerated with Ms. Bowen prior to her trial who testified Ms. Bowen had talked to them about this manslaughter. One of these witnesses provided only a vague statement that the shot occurred during an argument. This witness did not provide details of who was arguing, Ms. Bowen and Carr or Carr and the child, and what little detail she did provide was contradicted by the forensic evidence and other State witnesses. The second witness actually suggested that the child was murdered through an act of premeditation with the direct involvement of Ms. Bowen. Her testimony, too, was contradicted by the forensic evidence and the testimony presented by other State witnesses. In fact, these two witnesses directly contradicted each other. Both witnesses had numerous prior felony convictions. In its brief and oral argument, the State itself appeared reluctant to rely heavily upon the testimony of these two witnesses. We conclude that the testimony of these two witnesses, by itself, was not sufficient to support a determination beyond a reasonable doubt that a manslaughter occurred, or that Ms. Bowen knew a manslaughter had occurred.
[10] It should be noted that Ms. Bowen was charged with being an accessory after the fact to escape based upon sections 777.03 and 944.40, Florida Statutes (1997), not based upon section 843.12, Florida Statutes (1997).
[11] Prior to trial, Ms. Bowen's attorney sought to sever the accessory after the fact to manslaughter charge in order to have a separate trial on that charge. The trial court denied this request, and that decision is not specifically challenged in this appeal. In hindsight, that severance may have prevented the prejudice suffered by Ms. Bowen as a result of the lack of evidence on the manslaughter charge.
[12] Williams v. State, 110 So.2d 654 (Fla. 1959).